[L.A. No. 31376. Sept. 10, 1981.]

HARRIET KLARFELD, Plaintiff and Appellant, v.
EVERETT E. BERG, Defendant and Respondent.

**COUNSEL**

Hadassa K. Gilbert and S. Myron Klarfeld for Plaintiff and Appellant.

J. Gregg Evans and Robert T. Moulton for Defendant and Respondent.

**OPINION**

**MOSK, J.**—The City of Los Angeles has adopted an ordinance to control rental increases in "rental units." The sole issue in this action is whether that term applies to a room in a retirement residence in which the tenant, for a single charge, receives such services as meals, transportation and maid service, in addition to lodging. The trial court determined that a residence which provides such "amenities and facilities" is not within the rent regulation law and granted summary judgment in favor of defendant, the operator of the facility.

On August 30, 1978, the city enacted ordinance No. 151.415 (the rent roll-back ordinance). The ordinance declared that there was a growing shortage of housing units in the city, with resulting exorbitant rentals, and that this condition had a detrimental effect on the lives of a substantial number of the city's residents, endangering the health and welfare of senior citizens and persons of low income. Pending adoption of a measure to alleviate this problem, the ordinance rolled back certain rents, and declared a moratorium on most rent increases for a period of six months, or until the city council enacted an ordinance regulating rents, whichever came first. The ordinance applied to "Rental Units," which were defined as "[a]ll dwelling units designed for rental use or actually rented ... including single family dwellings ...." (Ord. No. 151.415, § 2 E.)[1]

---

[1]Ordinance No. 151.415 provided in part: "An ordinance rolling back rents and temporarily prohibiting rental increases.

"WHEREAS, in recent years there has been increasing concern on the part of public officials and residents of the city of Los Angeles regarding the existence of a housing

In March 1979, the city adopted ordinance No. 152.120 (L.A. Mun. Code, ch. XVI, art. 1, § 151.00 et seq., hereinafter the rent stabilization ordinance), which was an extension and refinement of the rent roll-back ordinance, and contained a declaration of purpose similar to that measure. (§ 151.01.) The stabilization ordinance also applied to "Rental

shortage and exorbitant rent increases in residential rental housing in this City; and

"WHEREAS, hearings conducted by the Council last year established that there is a growing shortage of decent, safe and sanitary housing units resulting in a critically low vacancy rate and rising exorbitant rents exploiting this shortage; that this condition is having a detrimental effect on the lives of a substantial number of the Los Angeles residents who reside in rental housing and is endangering the health and welfare of such residents, especially creating hardships on senior citizens, persons on fixed incomes, and persons of low income; and

"WHEREAS, the passage of Proposition 13, the property tax reform measure on the June 6, 1978 ballot, has meant substantial property tax decreases to most landlords in the City and the Council is now considering a measure to require landlords to pass on a portion of these tax savings to their tenants in the form of reduced rents; and

"WHEREAS, the California Supreme Court is now considering the constitutionality of Proposition 13 and the outcome of this litigation will be of substantial importance in determining the reasonableness and feasibility of such an ordinance, and therefore final Council action on such a proposal should await that Court's decision; and

"WHEREAS, the Council is now considering the feasibility and desirability of other measures designed to address the problems created by the housing shortage; and

"WHEREAS, since the passage of Proposition 13, there have been rapid and exorbitant rent increases throughout the City which increases have led to rent strikes, and may lead to the displacement of large numbers of residents of this City; and

"WHEREAS, the problem now requires immediate action; NOW THEREFORE, THE PEOPLE OF THE CITY OF LOS ANGELES DO ORDAIN AS FOLLOWS:

"Section 1. Purpose

"Pending the outcome of certain State Supreme Court litigation involving Proposition 13 and further study of the development and adoption of measures to address the problems created by the present housing shortage, it is necessary to temporarily roll back rents and, on an interim basis for a period of 6 months from the effective date of this ordinance, to prohibit most rental increases on rental residential units within the City of Los Angeles.

"Sec. 2. Definitions

"A. Housing Services: Services connected with the use or occupancy of a rental unit including, but not limited to, repairs, replacement, maintenance, painting, light, heat, water, elevator service, laundry facilities and privileges, janitor service, refuse removal, furnishings, telephone, parking and any other benefits, privileges or facilities.

"B. . . . . . . . . . . . . . . .

"C. Moratorium Period: The period of time beginning on the effective date of this ordinance and continuing for six months, or until such time as the City Council establishes a procedure for the adjustment and/or regulation of rents, whichever occurs first.

"D. Rent: The consideration, including any bonus, benefits or gratuity demanded or received, for or in connection with the use or occupancy of a rental unit or the transfer of a lease for such a unit, including but not limited to monies demanded or paid for parking, for furnishings, for housing services of any kind, for subletting, or for security deposits for damages and/or for cleaning.

"E. Rental Units: All dwelling units in the City of Los Angeles designed for rental use or actually rented at any time on or after June 1, 1977, including single family dwellings and mobile homes, together with the land and buildings appurtenant thereto, and all services, privileges, furnishings and facilities supplied in connection with the use

Units," but it set forth a detailed definition of the meaning of that term, i.e., "[a]ll dwelling units, efficiency dwelling units, guest rooms, and suites in the City of Los Angeles, as defined in Section 12.03" of the city's code, "together with . . . all housing services, privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, including garage and parking facilities." (Ord. No. 152.120, § 151.02 M.) Section 12.03 is contained in the provisions relating to zoning, and sets forth definitions applicable to the city's zoning laws. The section defines a "dwelling unit" as a "group of two or more rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes."[2]

---

or occupancy thereof, including garage and parking facilities. The term shall not include:

"(1) housing accomodations in hotels, motels, inns, tourist homes and rooming and boarding houses (which are rented primarily to transient guests for a period of less than fourteen (14) days);

"(2) dwelling units in non-profit cooperatives owned and controlled by a majority of the residents;

"(3) housing accommodations in any hospital, convent, monastery, extended medical care facility, asylum, non-profit home for the aged, or in dormitories owned and operated by an institution of higher education, a high school, or an elementary school;

"(4) dwelling units which a government unit, agency or authority owns, operates, or manages or which are specifically exempted from municipal rent regulation by state or federal law or administrative regulation;

"(5) dwelling units located in a structure completed or newly constructed after the effective date of this ordinance. . . ."

[2]Ordinance No. 152.120 provides in part:

"Sec. 151.00. Title

"This Chapter shall be known as the Rent Stabilization Ordinance of the City of Los Angeles.

"Sec. 151.01. Declaration of Purpose.

"There is a shortage of decent, safe and sanitary housing in the City of Los Angeles resulting in a critically low vacancy factor.

"Tenants displaced as a result of their inability to pay increased rents must relocate but as a result of such housing shortage are unable to find decent, safe and sanitary housing at affordable rent levels. Aware of the difficulty in finding decent housing, some tenants attempt to pay requested rent increases, but as a consequence must expend less on other necessities of life. This situation has had a detrimental effect on substantial numbers of renters in the City, especially creating hardships on senior citizens, persons on fixed incomes and low and moderate income households. This problem reached crisis level in the summer of 1978 following the passage of Proposition 13.

"At that time, the Council of the City of Los Angeles conducted hearings and caused studies to be made on the feasibility and desirability of various measures designed to address the problems created by the housing shortage.

"In August, 1978, pending development and adoption of measures designed to alleviate the City's housing crisis, Council adopted Ordinance No. 151.415 which temporarily rolled back recently imposed rent increases, and prohibited most rent in-

Plaintiff Harriet Klarfeld resided in a retirement residence known as Westwood Horizons. The facility had 301 units, consisting of private or semiprivate rooms and suites of rooms, none of which contained a kitchen. Plaintiff was 86 years old, had lived at the facility for 1-1/2 years, occupied a 10-by-12-foot room, and shared a bath with another tenant.

---

creases on residential rental properties for six months. Ordinance No. 151.415 expires on April 30, 1979.

"This Ordinance has successfully reduced the rate of rent increases in the City, along with the concomitant hardships and displacements. However, a housing shortage still exists within the City of Los Angeles and total deregulation of rents at this time would immediately lead to widespread exorbitant rent increases, and recurrence of the crisis, problems and hardships which existed prior to the adoption of the moratorium measure.

"Therefore, it is necessary and reasonable to regulate rents on a one year interim basis to provide an orderly deregulation process so as to safeguard tenants from excessive rent increases but at the same time provide landlords with just and reasonable returns from their rental units.

"Sec. 151.02. Definitions.

"The following words and phrases, whenever used in this Chapter, shall be construed as defined in this section. Words and phrases not defined herein shall be construed as defined in Section 12.03 of this Code, if defined therein.

". . . . . . . . . . .

"F. Housing Services: Services connected with the use or occupancy of a rental unit including, but not limited to, utilities (including light, heat, water and telephone), ordinary repairs or replacement, and maintenance, including painting. This term shall also include the provision of elevator service, laundry facilities and privileges, common recreational facilities, janitor service, resident manager, refuse removal, furnishings, parking, and any other benefits, privileges or facilities.

". . . . . . . . . . .

"K. Rent: The consideration, including any bonus, benefits or gratuity, demanded or received by a landlord for or in connection with the use or occupancy of a rental unit, or the assignment of a lease for such a unit, including but not limited to monies demanded or paid for parking, furnishings, housing services of any kind, subletting, or security deposits.

". . . . . . . . . . .

"M. Rental Units: All dwelling units, efficiency dwelling units, guest rooms, and suites in the City of Los Angeles, as defined in Section 12.03 of this Code, together with the land and buildings appurtenant thereto, and all housing services, privileges, furnishings and facilities supplied in connection with the use or occupancy thereof, including garage and parking facilities. . . . The term shall not include:

"1. Dwellings, one family.

"2. Housing accommodations in hotels, motels, inns, tourist homes and boarding and rooming houses, provided that at such time as an accommodation has been occupied by one or more of the same tenants for sixty (60) days or more such accommodation shall become a rental unit subject to the provisions of this Chapter.

"3. Housing accommodations in non-profit cooperatives owned and controlled by a majority of the residents.

"4. Housing accommodations in any hospital, convent, monastery, extended medical care facility, asylum, non-profit home for the aged, fraternity or sorority house, or housing accommodations owned, operated or managed by an institution of higher education, a high school or an elementary school for occupancy by its students.

"5. Housing accommodations which a government unit, agency or authority owns,

She paid a monthly charge of $555 a month, for which she was entitled to three meals a day, snacks, maid service, linen and cleaning services, and twice weekly bus service to nearby medical or social appointments, and she had the right to participate in recreational activities planned by the facility.[3] Westwood Horizons had 115 employees who spent most of their time providing services to the residents.

Plaintiff was notified that as of October 1, 1978, (after the effective date of the rent roll-back ordinance, but prior to the enactment of the rent stabilization ordinance) her "new monthly rate" would be raised to $595 a month. She refused to pay the charge, and was requested to vacate her room.

Thereafter, she filed this action on behalf of herself and other residents of Westwood Horizons, against the operator of the facility, alleging that the increase was barred by the terms of the rent roll-back ordinance. She sought a determination that defendant was not entitled to the increase, a refund for those residents of the facility who had paid increased charges in violation of the ordinance, and punitive damages. Following the filing of her complaint, plaintiff vacated her room at Westwood Horizons.

Defendant moved for summary judgment after adoption of the rent stabilization ordinance. He argued in support of the motion that the terms of the two ordinances should be construed together, and that since the stabilization ordinance in effect defined a "dwelling unit" as including a kitchen, the limitation on rent increases for "dwelling units" in the rent roll-back ordinance did not apply to Westwood Horizons, which contained no accommodations with kitchen facilities.

As we have seen, the trial court determined that the roll-back ordinance was not intended to apply to "amenities and facilities of the scope

---

operates, or manages, or which are specifically exempted from municipal rent regulation by state or federal law or administrative regulation.

"6. Housing accommodations located in a structure for which a certificate of occupancy was first issued after October 1, 1978.

"7. Luxury housing accommodations wherein as of May 31, 1978 the rent charged per month was at least $302 for a unit with no bedrooms; $420 for a unit with one bedroom; $588 for a unit with two bedrooms; $756 for a unit with three bedrooms; and $823 for a unit with four bedrooms or more...."

[3]Other services available to residents of Westwood Horizons were bellman and room service, all utilities except outside telephone, the services of an activities and social director, a beauty shop, and a coin-operated laundry.

furnished to plaintiff and her class here, even though one facility may be housing," and granted summary judgment to defendant.

On this appeal from the ensuing judgment, plaintiff maintains that the facts Westwood Horizons offers only rooms without kitchens, and that other facilities and services in addition to housing are included in the monthly charge, do not except the facility from the provisions of the city's rent regulation laws. We agree with these assertions.

In analyzing the text of these enactments, we are bound by the fundamental rule that it is our duty to adopt a construction which will effectuate the purpose which the legislative body sought to promote in enacting the statute or ordinance. (*People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville* (1968) 69 Cal.2d 533, 543 [72 Cal.Rptr. 790, 446 P.2d 790]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) There can be no doubt of the city council's purpose here, for both ordinances expressly provide that rising rents are endangering the health and welfare of the city's senior citizens, and both are aimed at controlling the amount of rent increases.

With this purpose in mind, we observe, first, that the rent roll-back ordinance contained no definition of a "dwelling unit." Defendant urges, nevertheless, that the city council must have had in mind the definition of that term in section 12.03 when it enacted the ordinance. This contention is of dubious merit. As we have seen, section 12.03 is a part of the city's zoning code, and there is no reference to that section in the rent roll-back ordinance.

More important, the exceptions contained in the roll-back ordinance indicated that the measure was intended to apply to residential units which did not include kitchens. There was a clear implication in the ordinance that hotels which were occupied by permanent residents for more than 14 days, and homes for the aged run for profit, were within the coverage of the rent regulations.[4] Since such accommodations ordinarily do not include kitchen facilities, it is implicit that the ordinance was not intended to apply only to "dwelling units" as defined in section 12.03, i.e., accommodations which include a kitchen.

---

[4]This implication arises from the fact that the roll-back ordinance provided that the term "rental units" shall not include (1) "housing accommodations in hotels, motels, inns, tourist homes and rooming and boarding houses (which are rented primarily to

But, claims defendant, the terms of the rent roll-back ordinance must be read with the language of the rent stabilization ordinance enacted a few months later. Defendant relies on the well-established rule that enactments with the same general purpose must be construed together to achieve a uniform and consistent legislative purpose, even though they may have been enacted at different times. (*Isobe* v. *Unemployment Ins. Appeals Bd.* (1974) 12 Cal.3d 584, 590 [116 Cal.Rptr. 376, 526 P.2d 528]; *County of Placer* v. *Aetna Cas. etc. Co.* (1958) 50 Cal.2d 182, 188-189 [323 P.2d 753].) Under these rules of construction, argues defendant, the definition of "dwelling units" in section 12.03 must be applied to that term as used in the rent roll-back ordinance even though it is only the later-enacted stabilization ordinance which expressly refers to section 12.03.

If we accept the principle that the two ordinances are to be read together, we must look to provisions of the stabilization ordinance in addition to the definition of a "dwelling unit" to determine the city council's intention regarding the scope of the roll-back ordinance. These additional provisions make explicit what was implied in the roll-back ordinance, i.e., that rental units without kitchens are encompassed within the rent limitations imposed by the city council. In the second ordinance, the term "rental units" is defined as including not only "all dwelling units" but also "guest rooms, and suites . . . as defined in Section 12.03." That section defines a "guest room" as "[a]ny habitable room except a kitchen, designed or used for occupancy by one or more persons and not in a dwelling unit," and a "suite" as "[a] group of habitable rooms designed as a unit, and occupied by only one family, but not including a kitchen or other facilities for the preparation of food, with entrances and exits which are common to all rooms comprising the suite." The room occupied by plaintiff obviously fits the definition of a "guest room" since it is a room used for occupancy by her and not in a "dwelling unit," as defined by section 12.03. The language of the rent roll-back ordinance, when interpreted in the light of the later enactment, therefore compels the conclusion that it applies to the type of accommodation occupied by plaintiff.

---

transient guests for a period of less than fourteen (14) days)" (Ord. No. 151.415, § 2 E(1)), or (2) "housing accommodations in any hospital, . . . extended medical care facility, . . . [or] non-profit home for the aged. . . ." (*Id.*, § 2 E(3).) Thus, the ordinance suggests by negative implication that hotel rooms occupied by permanent residents for more than 14 days and homes for the aged run for profit are covered by its provisions.

There is nothing in the language of these measures which excludes from coverage a residential facility which, like Westwood Horizons, includes meals and other services as part of a single overall charge. Indeed, the ordinances indicate otherwise. The rent stabilization measure, after declaring that "words and phrases . . . shall be construed as defined in Section 12.03," (Ord. No. 152.120, § 151.02), provides that accommodations in "hotels, motels, inns, tourist homes and boarding and rooming houses" which are occupied for 60 days or more by the same tenant, are subject to its terms (Ord. No. 152.120, § 151.02 M 2).[5] A "boarding or rooming house" is defined in section 12.03 as a "dwelling containing a single dwelling unit and not more than five guest rooms or suites of rooms, where lodging is provided *with or without meals*, for compensation." (Italics added.) And it is common knowledge that hotels and inns frequently provide many of the amenities supplied by Westwood Horizons, i.e., maid service, linen and cleaning service, a bellman and room service.

In addition, the rent stabilization ordinance, like the roll-back ordinance which it replaced, contains an exception for accommodations in a "non-profit home for the aged" (Ord. No. 152.120, § 151.02 M 4), again, by negative implication suggesting that a retirement residence like Westwood Horizons is within the scope of the rent regulations.[6]

In view of these conclusions, the trial court erred in granting summary judgment to defendant.

The judgment is reversed.

Bird, C. J., Tobriner, J., Richardson, J., Newman, J., and Spencer, J.,* concurred.

---

[5] The roll-back ordinance contained a similar provision (Ord. No. 151.415, § 2E (3)).

[6] The rent stabilization ordinance contains an exception to its terms not contained in the roll-back ordinance for "[l]uxury housing accommodations wherein as of May 31, 1978 the rent charged per month was at least $302 for a unit with no bedrooms; $420 for a unit with one bedroom; $588 for a unit with two bedrooms; $756 for a unit with three bedrooms; and $823 for a unit with four bedrooms or more." (Ord. No. 152.120, § 151.02 M 7.) We need not decide whether the fact that plaintiff paid $555 for a room, meals and other services, invokes this exception to the rent stabilization ordinance. The exception was not contained in the rent roll-back ordinance, which was the law in effect at the time defendant demanded that plaintiff pay an increased monthly charge, and defendant makes no claim based upon this provision.

*Assigned by the Chairperson of the Judicial Council.

KINGSLEY, J.*—I concur in the result. However I do not join the portion of the majority opinion that relies, in part, on the March 1979 ordinance.

As I read the record before us, the city council, faced with the situation explained in the preamble to the August 1978 ordinance, elected to stay *all* rent increases in the city, except in five situations—in one of which (exception No. 4) it had no jurisdiction to act and in the other four where the problem facing the council was unlikely to arise. In so acting, the council acted rationally to give it time, after study and hearings, to determine the reasonable extent of the exercise of its power over rents. We are here concerned only with the impact of the August ordinance. That, by March, the council had concluded that the overall prohibition was unnecessary and, then, so advised, enacted a different set of restrictions, has no bearing on its intent in August, when the "stay" ordinance was enacted. Only the August ordinance is before us in this case.

*Assigned by the Chairperson of the Judicial Council.