[No. D005978. Fourth Dist., Div. One. Sept. 30, 1988.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, Plaintiff and Respondent, v.
DOROTHY G. HAIGHT, Defendant and Appellant.

## COUNSEL

Monaghan & Metz, Brian D. Monaghan, John H. Metz, Elizabeth E. Kline and Linda G. Workman for Defendant and Appellant.

Shifflet, Sharp & Walters, William C. Shifflet, Gregory C. Kane and Christie Morgan for Plaintiff and Respondent.

## OPINION

**STANIFORTH, J.***—Plaintiff State Farm Mutual Automobile Insurance Company (State Farm) filed a complaint for declaratory relief against Johnson-Kinsey, Inc., Edward Allen Wenz, Jr., Mary L. Johnson, James Johnson, Paul Kinsey, Blake Bowen and Dorothy G. Haight (Haight), claiming the driver exclusion endorsement agreement in the State Farm automobile policy excluded Edward Allen Wenz, Jr. from protection under the policy. State Farm disputed Wenz's entitlement to a defense and indemnity, Johnson-Kinsey's entitlement to indemnity, and Bowen's and Haight's claim of entitlement for personal injuries.

Johnson-Kinsey cross-complained for bad faith against State Farm. Upon State Farm's motion to sever, the court ordered the trials for declaratory relief and the bad faith claim to be heard separately. After a nonjury trial in the declaratory relief action the court issued its statement of decision finding no insurance coverage under the State Farm policy. The court reasoned that Wenz was not hired to drive as that term is used in Insurance Code section 670.[1] Haight appeals the judgment.

### FACTS

Wenz was driving a 1970 Dodge Tradesman van on October 10, 1983, when it collided with an automobile driven by Haight at 70th Street and

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] All statutory references are to the Insurance Code unless otherwise specified.

Alma Way in La Mesa. Haight suffered serious injuries as a result of the accident.

Johnson-Kinsey has been the employer of Wenz since August 1981. Johnson-Kinsey is a building subcontractor firm specializing in drywall and suspended acoustical ceilings. The Dodge van driven by Wenz was owned by Johnson-Kinsey. Wenz contends there was insurance coverage because he was an employee and the collision occurred while he was on company time, that is, before 5 p.m. in the evening.

Wenz was an acoustical tile supervisor for Johnson-Kinsey. His work required him to travel daily throughout San Diego County and on occasion outside the county. As a general practice Johnson-Kinsey required him to travel to and from the job sites in his own vehicle. Wenz delivered materials and large equipment to the work sites. In order to carry this type of equipment, Wenz needed a truck. Normally he used his personal vehicle, a Chevrolet truck to perform these duties.

On the date of the collision with Haight, Wenz was returning home from a job site in Mission Valley. He had stopped at the office and then at the store for groceries while on his way home. His personal truck was in the garage for repairs. For that reason he was using the company van to transport materials and travel to and from home and to the work sites. Wenz intended to use the company van to travel to his work site the next day. At the time of the collision there were materials in the company van which pertained to the job.

On February 19, 1982, State Farm had issued an automobile insurance liability policy (No. 386-0298-619-55) to Johnson-Kinsey covering *its* company Dodge van. The policy contained a special endorsement excluding Wenz from coverage under the policy because he had received four prior speeding tickets while driving his personal vehicle on his own time. The principals for Johnson-Kinsey had signed this driver exclusion endorsement on February 19, 1982. It purported to exempt State Farm from responsibility for any loss caused by Wenz while driving the company van.

According to the testimony of witnesses, Mr. Weldon, a State Farm agent for 15 years, allegedly told Johnson-Kinsey and Wenz that this exclusion would remain in effect until Wenz was 25 years old. At trial, however, Weldon denied representing the exclusion would expire when Wenz reached the age of 25. Wenz had turned 25 on March 25, 1983, 7 months before the collision with Haight. The court made no finding regarding any such representation.

CONTENTIONS

Haight contends California section 670 precludes State Farm from refusing coverage to a company for an employee hired to drive because the driver has been convicted of certain traffic infractions *while operating his personal vehicle.* Section 670 (enacted in 1973) provides: "(a) *No admitted insurer* licensed to issue motor vehicle liability policies, as defined in Section 16450 of the Vehicle Code, *shall cancel, or refuse to renew, a motor vehicle liability insurance policy* covering drivers hired to drive by a commercial business establishment *nor execute the agreement specified in paragraph (1) of subdivision (d) of Section 11580.1 with respect to those drivers for the reason that those drivers have been convicted of violations of the Vehicle Code or the traffic laws of any subdivision of the state which were committed while operating private passenger vehicles not owned or leased by their employer.*" (Italics added.)

Vehicle Code section 16450 (referred to in § 670) provides as follows: "A 'motor vehicle liability policy,' as used in Chapter 2, 3 and 4 of this division, means an owner's policy or an operator's policy, or both, of liability insurance, certified as provided in [Vehicle Code] Section 16431 as proof of ability to respond in damages, issued by an insurance carrier authorized to transact such business in this State to or for the benefit of the person named therein as assured. . . ."

Vehicle Code section 16431 (referred to in § 16450) provides as follows: "*Proof of ability to respond in damages may be* given by the written certificate or certificates of any insurance carrier duly authorized to do business within the state, that it has issued to or for the benefit of the person named therein a motor liability policy as defined in [Vehicle Code] Section 16450, *which, at the date of the certificate or certificates is in full force and effect.*" (Italics added.)

Section 11580.1, subdivision (d) (referred to in § 670) provides as follows: "Notwithstanding the provisions of paragraph (4) of subdivision (b), or the provisions of Article 2 (commencing with section 16450) of Chapter 3 of Division 7, or Article 2 (commencing with section 17150) of Chapter 1 of Division 9, of the Vehicle Code, the insurer and any named insured may, by the terms of any policy of automobile liability insurance to which subdivision (a) applies, or by a separate writing relating thereto, agree as to either or both of the following limitations, such agreement to be binding upon every insured to whom such policy applies and to every third party claimant:

"(1) That coverage and an insurer's obligation to defend under such policy shall not apply nor accrue to the benefit of any insured or any third

party claimant while any motor vehicle is being used or operated by a natural person or persons designated by name."

Section 670 further authorizes a named driver exclusion ("*may* be issued") if the driver has been convicted of certain serious Vehicle Code violations of greater significance than a common speeding violation as were Wenz's.

Haight contends the plain, explicit words of section 670 expressly prohibit the type of exclusion which State Farm imposed here; she argues if there is any requirement to resort to extrinsic circumstances to ascertain the intent of the drafters, the history of section 670 as well as the interpretation placed on it by scholars in the field lead to one conclusion: both the employer and Wenz were covered.

■ State Farm, alternatively, contends the effect of the language of section 670 and particularly its reference to Vehicle Code section 16450 ("as defined in Vehicle Code section 16450") incorporates and limits the section to only that type of policy which is referred to in Vehicle Code section 16450. It is argued section 670 is, by this language, limited to a liability policy which is issued *after* there has been an accident and where a person involved in the accident seeks to submit proof of ability to respond in damages. State Farm contends section 670 is limited in its applicability to motor vehicle liability policies *which have been certified as proof of ability to respond in damages as provided in Vehicle Code section 16431 after an accident has occurred.*

State Farm argues these various code sections when read in pari materia require a person *who has been involved in an accident* as described in Vehicle Code section 16000 to establish proof of financial responsibility with the Department of Motor Vehicles; such "certified policy" is a postaccident policy. State Farm argues because the policy here was issued to Johnson-Kinsey before the accident, Vehicle Code section 16450 permits exclusion of named drivers like Wenz by its reference to section 11580.1, subdivision (d)(1).

## DISCUSSION

### I

There are several problems with the argument made by State Farm. First, the language of section 670 as well as the incorporated section are clear and unambiguous. Section 670 applies to "*a motor vehicle liability insurance*

*policy"* (italics added) and specifically prohibits application of the section 11580.1, subdivision (d)(1), driver exclusion in certain specified circumstances.

■ A court is required to give effect to the plain meaning of a statute where its language is clear and unambiguous. (*Donahue* v. *LeVesque* (1985) 169 Cal.App.3d 620 [215 Cal.Rptr. 388].) Section 670, subdivision (a), clearly states, "No admitted insurer licensed to issue motor vehicle liability policies, as defined in Section 16450 of the Vehicle Code, shall cancel, or refuse to renew, a motor vehicle liability insurance policy covering drivers hired to drive by a commercial business establishment nor execute the agreement specified in paragraph (1) of subdivision (d) of section 11580.1 . . . ." (The driver exclusion agreement.) ■ State Farm argues the phrase "as defined in section 16450 of the Vehicle Code" refers to the "motor vehicle liability policies," the last four words before the comma. State Farm contends this phrase limits the type of policy to which section 670, subdivision (a) has applicability to a policy *issued after an accident,* not to motor vehicle liability policies generally.

Clearly, the language of section 670 contains no such limitation to post accident specifications of insurance. Rather it describes the class of insurers which Vehicle Code section 16450 defines and to which it applies. It applies to insurers who are "admitted" and "licensed to issue motor vehicle liability policies, as defined in Section 16450 of the Vehicle Code . . . ." Unequivocally, section 670 specifically prohibits this class of insurers from executing a driving exclusion agreement as specified in section 11580.1, subdivision (d). The plain language of this section points to this construction. The word "a" is an indefinite article used as a function word before singular nouns when the object in question is unspecified. Thus, section 670 does not specify the type of motor vehicle policy to which its prohibition applies beyond simply stating that the policy must cover drivers hired to drive by commercial business establishments. The indefinite article "a" is used to describe "motor vehicle liability policy" without any specification as to the time when such policy was issued.

Section 670 specifically declares the so defined class of insureds may not execute a driver exclusion agreement with regard to a driver hired to drive, where the exclusion is based upon the driver's private vehicle driving record. There is nothing in the language of section 670 which even remotely hints that such an agreement is prohibited only when a policy is executed *after* an accident to supply proof of financial responsibility. Such a contention results in an absurd meaning, out of step and context with the manifest purpose of the financial responsibility laws of California.

## II

Vehicle Code section 16450 defines "[a] 'motor vehicle liability policy' as used in Chapters 2, 3 and 4 of this division [as] an owner's policy or an operator's policy, or both, of liability insurance, certified as provided in [Vehicle Code] Section 16431 as proof of ability to respond in damages . . . ."

The resolution of the argument tendered by State Farm requires not only the examination of "Chapters 2, 3 and 4," but also the various applicable provisions of the entire automobile financial responsibility law (Veh. Code, §§ 16000-16503). By reading these statutes in pari materia we determine the legislative intent.

■ The automobile financial responsibility law must be construed to foster its main objective of providing monetary protection to those who suffer great injury through the negligent use of highways by others. (*Ohio Cas. Ins. Co.* v. *Armendariz* (1964) 224 Cal.App.2d 56 [36 Cal.Rptr. 274]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914]; *Jess* v. *Herrmann* (1979) 26 Cal.3d 131, 138-139 [161 Cal.Rptr. 87, 604 P.2d 208].)

To accomplish this objective, chapter 1 of division 7, sections 16000 to 16070 of the Vehicle Code established the compulsory financial responsibility of the driver of the motor vehicle who is in any manner involved in an accident originating from the operation of the motor vehicle on the street or highway with damage in certain minimum quantities.

Vehicle Code section 16000.7 defines an *uninsured* motor vehicle as "a motor vehicle for which financial responsibility as provided in Section 16021 *was not in effect at the time of the accident*." (Italics added.) Vehicle Code section 16020 requires every driver or owner "shall, at all times, maintain in force one of the forms of financial responsibility specified in [Vehicle Code] section 16021." Vehicle Code section 16021, subdivision (b) declares financial responsibility is established if "[a]n insurer or obligee under a form of insurance or bond . . . complies with the requirements of this division and . . . covers the *driver for the vehicle involved in the accident*." (Italics added.)

*Proof* of financial responsibility as required by the foregoing sections may be established by a variety of means, e.g., a bond or certificate of self-insurance. Proof may be established by the filing with the department of satisfactory evidence under Vehicle Code section 16054, subdivision (a), "That *the owner had an automobile liability policy . . . or bond in effect at the time of*

*the accident with respect to the driver or the motor vehicle involved in the accident , . . ."* (Italics added.) Vehicle Code section 16056 sets out the minimum requirements for the policy of insurance or bond required to be in effect at the time of the accident. Chapter 1 further deals with the procedures on suspensions of license. Vehicle Code section 16070 declares upon the failure of the driver to prove "financial responsibility as required [in the earlier sections] at the time of the accident, the department shall . . . suspend the privilege of the driver . . . to drive . . . ."

### III

Chapter 2 (referred to in Vehicle Code section 16450) deals with the suspension following an unsatisfied judgment. Chapter 2 declares where a judgment has been obtained against a person for the wrong committed in the operation of a motor vehicle such person may under Vehicle Code section 16375 file an affidavit of insurance "stating that *at the time of the accident upon which the judgment has been rendered he was insured,* that the insurer is liable to pay such judgment, and the reason, if known, why the insurance company has not paid the judgment. He shall also file the original policy of insurance or a certified copy thereof, if available, . . ." (Italics added.) The department is then authorized to reinstate, if it is satisfied the insurer is able to pay such judgment to the extent of the financial responsibility law's minimum requirements.

Under Vehicle Code chapter 2, after a suspension of license has occurred due to an unsatisfied judgment (Veh. Code, § 16370) no license shall be issued to the judgment debtor unless the judgment debtor *"gives proof of ability to respond in damages as provided in Chapter 3 (commencing* with [Vehicle Code] section 16430), *and* until . . . the judgment is satisfied [as] provided in this chapter . . . ." (Veh. Code, § 16371, italics added.)

Thus, a certificate under Vehicle Code section 16431 may be issued to meet one of the requirements of section 16371. This species of certificate would be proof of a *postaccident* policy. (See *Colonial Ins. Co. v. Montoya* (1986) 184 Cal.App.3d 74 [228 Cal.Rptr. 833].)

Thus, under chapter 2, a "certified" policy could include a policy in effect at the time of the accident (§ 16375) as well as a postaccident policy (§ 16371) required as one of the two conditions to reinstate a suspended license.

### IV

Chapter 3, sections 16430 and 16431 (referred to in section 16450) of the Vehicle Code, deals with the *manner* of "proof of ability to respond in

damages." Section 16430 is most explicit as to minimum amounts of financial responsibility. It declares proof of ability means proof of ability to respond in damages resulting from the ownership or operation of a motor vehicle in certain specified limited amounts. This proof may be supplied in a variety of ways, 1) by bond (§ 16434), 2) deposit of money (§ 16435), 3) as "self-insured" (§ 16436), and 4) "by the written certificate or certificates of any insurance carrier duly authorized to do business within the state, that it has issued to or for the benefit of the person named therein a motor vehicle liability policy as defined in [Vehicle Code] Section 16450, which, at the date of the certificate or certificates is in full force and effect." (Veh. Code, § 16431.)

The "certificate or certificates of any insurance carrier" are authorized by section 655 of the Insurance Code which provides: *"Every insurer issuing policies of motor vehicle liability insurance within the meaning of Section 16450 of the Vehicle Code, shall also, as an incident thereto, complete and file the certificate or certificates provided for under Sections 16431, 16432 of the Vehicle Code."* (Italics added.)

"Vehicle Code §§ 16430-16480 require persons involved in an automobile accident to provide the Department of Motor Vehicles with proof of ability to respond in damages. Such proof may be in the form of a certificate prepared by the individual's insurer (§ 16431), by bond (§ 16434), or by the deposit of $35,000 with the department (§ 16435). Prior to Chapter 356, an insured was not required to complete a certificate for proof of ability to respond in damages. Chapter 356 adds Section 655 to the Insurance Code to require every insurer issuing policies of motor vehicle liability insurance to complete and file the certificate or certificates provided for under Vehicle Code §§ 16431 and 16432. This Chapter also provides the Insurance Commissioner with authority to enforce filing under these sections." (4 Pacific L.J. 526, 535.)

One class of certificate referred to in section 16431 is required as proof that the person who has been involved in an automobile accident has the ability to respond in damages. (Veh. Code, §§ 16000.7, 16020, 16021, subd. (e), 16054, subds. (a) & (b), 16070.) *This species of certificate does not pertain to a postaccident type of insurance policy.* There are other types of certificates evidencing insurance obtained preaccident. For example, as noted in *Glen Falls Ins. Co.* v. *Consolidated Freightways* (1966) 242 Cal.App.2d 774 [51 Cal.Rptr. 789], there can be a certificate of self-insurance, indicating the self-insured owner/operator is financially responsible for a previous accident.

V

Chapter 4 deals with commercial vehicles and again the ability to respond in damages. Vehicle Code section 16502 provides, "No owner shall use or with his consent permit the use of, any vehicle used in the transportation of persons or property in the conduct of a business, without maintaining ability to respond in damages as required by this chapter." The type of insurance policy referred to is that type which would be in effect at the time of the accident if coverage (financial responsibility) for an accident of an employee is the purpose.

A fair reading of the entire financial responsibility law leaves no doubt that the reference in section 670 to section 16450 of the Vehicle Code should not be limited only to a policy issued postaccident. No hint of any such meaning can be found in any of chapters 2, 3 or 4. There is no merit in the arguments offered by the insurance company to the effect that chapters 2, 3 or 4 in any way limit the type of coverage by policies issued postaccident.

A similar conclusion is expressed in *Glen Falls Ins. Co.* v. *Consolidated Freightways, supra,* 242 Cal.App.2d at pages 779-780. The appeal court concluded after a review of provisions of the automobile financial responsibility law: "So far as is pertinent to our present discussion, exemption from the requirement of security may be established, among other ways, by showing that the owner of the motor vehicle involved in the accident is a self-insurer ([Veh. Code,] § 16055) [footnote omitted]; or by filing with the motor vehicle department satisfactory evidence that the owner had a motor vehicle liability policy or bond complying with the statutory requirements in effect at the time of the accident with respect to the driver or the motor vehicle involved or that the driver, if he was not the owner, had such a bond or motor vehicle liability policy with respect to his operation of a nonowned motor vehicle. ([Veh. Code,] §§ 16057, 16059.)" We look in vain for any hint that the provisions of chapter 2, 3 or 4 are to be limited to motor vehicle liability policies procured postaccident.

VI

Assuming, arguendo, the reference in section 670 to "section 16450 of the Vehicle Code" creates an ambiguity as to whether the policies referred to are those issued before or after an accident, the legislative history sheds light and compels this conclusion: section 670 applies to a motor vehicle liability insurance policy issued before an accident and specifically precludes a section 11580.1, subdivision (d)(1), driver exclusion agreement.

The legislative history reveals the bill (Assem. Bill No. 811 (1973-1974 Reg. Sess.)) was uncontroversial and was widely accepted by the Legislature. The bill was simple. It limited the insurance industry's practice of penalizing drivers on the job for their off-the-job driving records.

■ The successive drafts of Assembly Bill No. 811 before the Legislature are helpful in interpreting a statute if it is conceded that the meaning is unclear. (*Estate of Wanamaker* (1977) 65 Cal.App.3d 587 [135 Cal.Rptr. 333].) Assembly Bill No. 811 was introduced by Assemblyman Deddeh on March 19, 1973. The first draft *sought to amend section 11580.1 to add subdivision (f)* which stated that the driver exclusion agreements permitted by section 11580.1, subdivision (d)(1) were prohibited by section 670 where the driver was hired to drive and where the basis of the exclusion was the driver's private driving record.

Subsequent drafts of Assembly Bill No. 811, including the draft enacted into law, did not seek to amend section 11580.1. Instead the bill set forth versions of section 670 which expressly stated section 11580.1, subdivision (d)(1), driver exclusion agreements were not permitted to be executed under section 670 where the driver was hired to drive.

If the Legislature had intended section 670's prohibition not apply to liability policies issued before an accident then the first draft of Assembly Bill No. 811 would have amended subdivision (f) of section 11580.1 to state that all subdivisions of section 11580.1 did not apply to section 670 as opposed to stating (as enacted) that just subdivision (d)(1) of section 11580.1 did not apply.

■ Next, the committee analysis may be examined to determine legislative intent. (*Tappe* v. *Lieberman* (1983) 145 Cal.App.3d Supp. 19 [193 Cal.Rptr. 514].) The analysis by the Senate Committee on Insurance and Finance of Assembly Bill No. 811 as amended June 7, 1973, states: "ANALYSIS: AB 811, as amended June 7, 1973 adds a new provision to the Insurance Code to prohibit an insurer from 1) cancelling, 2) refusing to issue, or 3) refusing to renew a motor vehicle liability insurance policy issued to a commercial business establishment covering the motor vehicle drivers employed by the establishment for the reason the drivers have been convicted of violations of the Vehicle Code which were committed while operating a vehicle other than that which they were hired to drive."

The committee analysis by the Assembly Committee on Finance and Insurance states: "This bill would prohibit an insurer from canceling, refusing to issue, or refusing to renew a motor vehicle liability insurance policy issued to a commercial business establishment covering the motor vehicle

drivers employed by the business establishment for the reason that the drivers have been arrested for, cited for, or convicted of violations of the Vehicle Code which were committed while operating a vehicle other than that which they were hired to drive.

"The bill is sponsored by the Teamsters Union which maintains that insurance companies are threatening to cancel employers' motor vehicle liability insurance because certain of the drivers have bad driving records while driving their private passenger cars. This forces the employer to fire the employee since he does not wish to lose his insurance.

"The proponents maintain that an insurance policy should be canceled because of the driver's record when driving the commercial vehicle but not because of the driver's record while driving his privately owned motor vehicle since the driving habits of a person may be quite different when driving for his employer."

Neither committee analyzed Assembly Bill No. 811 as confined to policies issued after an accident.

■ Furthermore, in determining statutory intent, this court may properly consider the digest of the Legislative Council. (*People* v. *Martinez* (1987) 194 Cal.App.3d 15 [239 Cal.Rptr. 272].) The Legislative Council's legal analysis was simply entitled "Liability Insurance," and stated: "Prohibits, with certain exceptions, an insurance company from canceling or refusing to renew a motor vehicle liability insurance policy covering the drivers employed by a commercial business establishment or executing an agreement of noncoverage as to designated drivers, on the basis of the driving record of any of the drivers while operating vehicles other than those they were hired to drive." (Legis. Counsel's Dig., Assem. Bill No. 811, 2 Stats. 1973 (Reg. Sess.) Summary Dig. p. 110.)

Here again, the Legislative Council's Digest does not limit the type of section 670 motor vehicle insurance policy to postaccident situations.

■ Next, matters which were enacted for the same general purpose must be construed together to achieve a uniform and consistent legislative purpose. (*Klarfeld* v. *Berg* (1981) 29 Cal.3d 893 [176 Cal.Rptr. 539, 633 P.2d 204].) ■ Thus, in examining sections 660 through 679.73, including section 670, the purpose of the enactment was to limit the absolute right of insurance policy cancellations. As was stated by the court in *Spindle* v. *Travelers Ins. Companies* (1977) 66 Cal.App.3d 951, 957 [136 Cal.Rptr. 404]: "Sections 660 through 679.73 of the Insurance Code deal with the subjects of cancellation and failure to renew particular kinds of insurance

policies such as automobile liability policies and property loss policies. Section 661 sets forth and limits specifically the grounds upon which an automobile liability or collision policy may be cancelled, and section 676 specifies and limits the grounds for cancellation of property loss policies. In addition, section 679.71 [added by Stats. 1973, ch. 772, § 1, p. 1385] declares that real or personal property loss insurance policies may not be canceled because of the insured's marital status, sex, race, color, religion, national origin, or ancestry. These sections reflect legislative policy limiting the 'absolute' right of insurance policy cancellation."

Furthermore, section 670 is not included in the sections of the Insurance Code which pertain to policies issued after an accident; nor is it included among the sections of the Insurance Code which pertain to policies issued before an accident. It stands alone and is surrounded by provisions which exist for the sole purpose of limiting an insurance company's right of cancellation. Clearly evident is the legislative intent that section 670 act as a broad limit upon the insurer's rights of cancellation.

One further rule of construction is applicable here. ■ A special statute dealing expressly with a particular subject constitutes an exclusion, so as to take precedence over a conflicting general statute on the same subject. (*Kennedy* v. *City of Ukiah* (1977) 69 Cal.App.3d 545, 552 [138 Cal.Rptr. 207]; *Busic* v. *United States* (1980) 446 U.S. 398 [64 L.Ed.2d 381, 100 S.Ct. 1747].) This rule applies regardless of whether the special statute was enacted before or after the general one. (*People* v. *Randano* (1973) 32 Cal.App.3d 164 [108 Cal.Rptr. 326]; *Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [387 P.2d 377].) Section 670 is a most specific statute enacted long after section 11580.2, subdivision (d)(1).

## VII

Section 670 should also to be examined as being in pari materia with section 488. Section 488 states: "No insurer shall, in issuing or renewing a private passenger automobile insurance policy, increase the premium on that policy for the reason that the insured or applicant for insurance has been convicted for traffic violations committed while operating a motor vehicle for compensation during the hours of his employment . . . ."

■ Both sections 488 and 670 share the same purpose, to wit: they seek to limit the insurer's practice of penalizing an insured for vehicle violations occurring during unrelated portions of the driver day. The reason is obvious: the driving habits of a person may be quite different when driving on the job as opposed to off the job. By construing sections 488 and 670 in pari materia, it is clear that section 670's reference to Vehicle Code

section 16450 is made only to describe a class of insurers, not to limit the type of motor vehicle policies to which section 670's prohibition applies. Section 488 gives no description of the type of insurer to which the prohibition applies. Thus, sections 488 and 670 differ only in the degree of specificity used in defining the applicable insurer.

## VIII

The scholarly comments upon section 670 do not view its application as limited to policies issued after an accident. The Continuing Education of the Bar authors interpret section 670 as applying to all insurance policies: "Insurance Code [section] 670 prohibits refusal to renew or cancellation of *policies issued to commercial business establishments* if the policy's exclusion is based on Vehicle Code violations that occurred when the driver was operating a passenger vehicle not owned or leased by the employer. The named-driver exclusion may be issued if the driver has been convicted of certain serious Vehicle Code violations specified in Insurance Code section 670(b)." (Cal. Automobile Insurance Law Guide (Cont.Ed.Bar, Supp. 1985) p. 39.)

Finally, had the framers of section 670 wanted to limit section 670's prohibition to automobile policies issued after an accident, they could have easily done so by using a variety of limiting adjectives. This they did not do. Also the framers could have used more direct language to include a description of "a policy which is certified as proof of liability to respond in damages as provided in section 16431 of the Vehicle Code." No such language or hint of such meaning is to be found in section 670.

## IX

The foregoing rules of statutory construction are to be applied only where there is an ambiguity or conflict in the provisions of the statute or where literal interpretation would lead to absurd consequences. (*Constaneda* v. *Holcomb* (1981) 114 Cal.App.3d 939 [170 Cal.Rptr. 875].) A reading and interpretation of the plain, explicit words of section 670, far from leading to an absurd consequence, leads to a logical result, clearly conforming to the legislative intent. In contrast, to follow the reasoning of State Farm through its tortuous examination of the various incorporated-by-reference code sections results in a conclusion which flies in the face of a most clear and explicit legislative intent. A careful examination of Vehicle Code sections 16450 and 16431 gives no support to State Farm's contentions.

X

State Farm next argues Wenz was "not hired to drive," but rather was "hired to supervise" acoustical work. It is further asserted he was not acting within the scope of his employment at the time of the accident.

State Farm points to the definition of a driver as found in Vehicle Code section 305 and asserts this section should be used to determine if Wenz was "a driver hired to drive." Vehicle Code section 305 states: "a driver is a person who drives or is in actual physical control of a vehicle." Clearly the facts of this case point conclusively to the fact that Wenz was a driver under Vehicle Code section 305. He was in actual physical control of the vehicle at the time of the accident. Vehicle Code section 305 does not give insight concerning Wenz's being "*hired* to drive".

State Farm further argues that in order to be qualified under section 670, driving must be the *principal* reason for which the person is employed. No basis in law is found for such a definition of being "hired to drive". In this regard State Farm's reliance upon Vehicle Code sections 70 and 71 is misplaced. These sections setting forth the "principal purpose" definition are promulgated for licensing purposes. Moreover, they are no longer the law.

XI

The issue here is not Wenz's licensing, but rather whether the "hired to drive" concept falls within the ambit of the doctrine of respondeat superior. The doctrine of respondeat superior seeks to place the losses caused by torts of employees, which as a practical matter are almost certain to occur in the context of the employer's enterprise, upon the enterprise itself as a required cost of doing business. As was said in *Huntsinger* v. *Glass Containers Corp.* (1972) 22 Cal.App.3d 803, 808 [99 Cal.Rptr. 666], citing *Johnson* v. *Long* (1947) 30 Cal.2d 54, 64 [181 P.2d 645]: " 'The principal justification for the application of the doctrine of *respondeat superior . . .* is the fact that the employer may spread the risk through insurance and carry the cost thereof as part of his costs of doing business.' "

Harper and James state the focus of the doctrine thus: " ' "We are not here looking for the master's fault but rather for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has under-taken. . . . Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise." ' (2 Harper and James, The Law of Torts (1956) pp. 1376-1377, quoted in *Hinman* v. *Westinghouse Elec. Co.* . . . . 2 Cal.3d [956,] 960 [88

Cal.Rptr. 188, 471 P.2d 988].)" (*Lazar* v. *Thermal Equipment Corp.* (1983) 148 Cal.App.3d 458, 464 [195 Cal.Rptr. 890].)

In interpreting the term "hired to drive" to include drivers driving within the scope of employment, the risk of injury from employees who were driving within the scope of employment is spread through insurance. Thus, the purpose of applying the doctrine of respondeat superior is fulfilled. To hold otherwise would mean an employer could be held liable under the doctrine of respondeat superior for driving torts of the employees but would not have any insurance coverage for protection against damages arising from such torts. This would be an unreasonable interpretation of the "hired-to-drive" language.

## XII

Assuming respondeat superior applies generally to Wenz's driving on company business, State Farm next claims Wenz was outside the scope of his employment at the time of the accident. State Farm relies upon the "going and coming" rule.

The cases of *Martinell* v. *Stabnau* (1935) 11 Cal.App.2d 38 [52 P.2d 956], and *Carnes* v. *Pacific Gas & Elec. Co.* (1937) 21 Cal.App.2d 568 [69 P.2d 998] involve employees going home for lunch at the time of an accident. The act of taking a car for lunch has been differentiated from taking a car home for the evening and returning it to the work place in the morning.

A well-known exception to the going-and-coming rule arises *where the use of the car gives some incidental benefit to the employer.* Thus, the key inquiry is whether there is an incidental benefit derived by the employer. (See *Huntsinger* v. *Glass Containers Corp., supra,* 22 Cal.App.3d at p. 811.) The question is not who owns the vehicle (see *Largey* v. *Intrastate Radiotelephone, Inc.* (1982) 136 Cal.App.3d 660 [186 Cal.Rptr. 520]), or whether the employee receives reimbursement by the employer for the vehicle (see *Richards* v. *Metropolitan Life Ins. Co.* (1941) 19 Cal.2d 236 [120 P.2d 650]), or whether the employee performs a personal errand while driving home. (See *Lazar* v. *Thermal Equipment Corp., supra,* 148 Cal.App.3d 458, 464-466; *Avila* v. *Standard Oil of California* (1985) 167 Cal.App.3d 441, 448 [213 Cal.Rptr. 314]; *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 970 [227 Cal.Rptr. 106, 719 P.2d 676]; *Joseph* v. *Office of Consulate General* (9th Cir. 1987) 830 F.2d 1018, 1025, 1026.)

The evidence is uncontradicted Wenz's use of the company vehicle in his job clearly gave Johnson-Kinsey an incidental benefit. Wenz was driving a company vehicle with company equipment in the van and return-

ing to his home from engaging in company activity. Wenz had duties both in the office and in the field. He was required to use his vehicle to travel to work sites. He delivered materials in his vehicle to the work site. He was required to travel throughout the county and sometimes outside the county. It was an express condition of his employment that Wenz use the vehicle in attending to his duties.

The fact that the accident occurred when Wenz was on his way home from work is not determinative of the scope of employment. In *Huntsinger* v. *Glass Containers Corp., supra,* 22 Cal.App.3d 803, 810, the court said: " 'The cases . . . indicate that exceptions will be made to the "going-and-coming" rule where the trip involves an incidental benefit to the employer.' " *Huntsinger* held the employee "driving his vehicle to and from the office was, therefore, incidentally beneficial to [the employer] in a manner not common to the commute trips by ordinary members of its work force. In other words, when a business enterprise requires an employee to drive to and from its office in order to have his vehicle available for company business during the day, accidents on the way to and from the office are statistically certain to occur eventually, and, the business enterprise having required the driving to and from work, the risk of such accidents are risks incident to the business enterprise." (*Id.* at p. 810.)

Finally, in the recent case of *Lazar* v. *Thermal Equipment Corp., supra,* 148 Cal.App.3d 458, the court held the doctrine of respondeat superior applies where an accident occurs while the employee was driving his employer's truck on a personal errand on his way home from work. In *Lazar* the uncontroverted evidence demonstrated the employer derived a special benefit from the project supervisor's commute so that the employee's driving fell within the scope of his employment. (*Id.* at p. 464.) The *Lazar* court *held the project supervisor's personal errand was a "foreseeable" and minor deviation from the scope of his employment.* Only a substantial deviation or departure takes the employee outside the scope of his employment. (*Id.* at pp. 464-466.)

The *Lazar* court reasoned: "[Whether] an employee's action [is] within or outside the scope of employment . . . begins with a question of foreseeability, i.e., whether the accident is part of the inevitable toll of a lawful enterprise." (*Lazar* v. *Thermal Equipment Corp., supra,* 148 Cal.App.3d. at p. 464.) The classic analysis of the question of foreseeability in this context is made in *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608 [124 Cal.Rptr. 143], where an employee was injured in a fight between employees on the employer's premises. For mutual convenience, the employer allowed the employees to stay on its premises after the workday ended; the employees drank three or four beers apiece. A fight ensued when one refused to give the others a ride on a piece of heavy equipment. Rather than searching

for word-laden distinctions placing the employees' actions within or outside the scope of employment, the *Rodgers* court spoke in terms of foreseeability. "One way to determine whether a risk is inherent in, or created by, an enterprise is *to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, 'foreseeability'* in this context *must be distinguished from 'foreseeability'* as a test for negligence. In the latter sense 'foreseeability' means a level of probability which would lead a prudent person to take effective precautions whereas 'foreseeability' as a test for *respondeat superior* merely means that in the context of the particular enterprise an employee's conduct if *not so unusual or startling that it would seem unfair to include the loss* resulting from it among other costs *of the employer's business.*" (*Rodgers* v. *Kemper Constr. Co., supra,* 50 Cal.App.3d at pp. 618-619.) (Italics added.)

█ Witkin describes the traditional distinction as follows: "The question is often one of fact, and the rule now established is that only a *substantial* deviation or *departure* takes the employee outside the scope of his employment. If the main purpose of his activity is still the employer's business, it does not cease to be within the scope of the employment by reason of incidental personal acts, slight delays, or deflections from the most direct route. The term 'deviation' is ordinarily used to describe these minor deflections, and 'departure' to describe the abandonment which takes the acts outside the scope of employment." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 166, p. 765, italics added.) Thus the acts at issue may involve a combination of the employee's personal business and the employer's business (*Perez* v. *Van Groninger & Son, supra,* 41 Cal.3d 962) and fall within respondeat superior. As was said in *Lazar* v. *Thermal Equipment Corp., supra,* 148 Cal.App.3d at p. 466: "While a decision to stop at a party, or a bar, or to begin a vacation, might not have been foreseeable, we can think of no conduct more predictable than an employee's stopping at a store to purchase a few items on the way home. Where, as here, the trip home is made for the benefit of the employer, in the employer's vehicle, accidents occurring during such minor and foreseeable deviations become part of the 'inevitable toll of a lawful enterprise.'

"No evidence or inference was presented in the trial court showing that Lanno's deviation was for any purpose other than to stop at a store before returning home. Since we find such a deviation to be minor and foreseeable, under the standard set forth in *Clemmer* v. *Hartford Insurance Co.* . . . 22 Cal.3d 865, 887-878 [151 Cal.Rptr. 285, 587 P.2d 1098], the judgment notwithstanding the verdict was properly granted. (See also *Golden West Broadcasters, Inc.* v. *Superior Court* (1981) 114 Cal.App.3d 947, 956 [171 Cal.Rptr. 95]; *Munyon* v. *Ole's Inc.* (1982) 136 Cal.App.3d 697, 701 [186 Cal.Rptr. 424].)"

 The facts of *Lazar* are similar to those here. When Wenz hit Haight with the company van he was "hired to drive," driving that van and was within the scope of his employment. The acts in question were foreseeable, within the scope of Wenz' employment.

DISPOSITION

The judgment is reversed.

Work, Acting P. J., concurred.

**TODD, J.**—I regretfully concur. The anomalous result in this case is hard for me to swallow. Edward Allen Wenz, Jr., (Wenz) son of Mary L. Johnson (a principal and officer of Johnson-Kinney, Inc., the owner of the vehicle in this accident) will be provided additional auto insurance coverage by plaintiff State Farm Mutual Automobile Insurance Company through the fortuitous circumstance his own truck was inoperable on the date in question. Although Johnson-Kinney followed a policy of not permitting employees such as Wenz to drive firm-owned vehicles, this young man's status as the boss's son apparently brought him special consideration. While Wenz's truck was being repaired, he drove the firm's Dodge van and allegedly caused the accident injuring Dorothy Haight. Despite the fact State Farm and Johnson-Kinney had specially agreed there would be no coverage for Wenz, Insurance Code section 670 compels this result. The named person exclusion for Wenz is forbidden by section 670 when it is based upon an employee's bad driving record off the job. Wenz's record of traffic citations caused State Farm to obtain the exclusion agreement with Johnson-Kinney.

The anomaly results from the circumstance Wenz was given permission to drive the company van while his truck was in the shop. Through this violation of company policy, section 670 becomes applicable. Since Wenz is required to provide his own mode of travel to job sites and the company office, he is "hired to drive" within the meaning of section 670. Even though driving is only incidental to his primary duty as a supervisor, the broad language employed by the Legislature in section 670 compels this result.

Insurance Code section 488[1] (construed in pari materia with section 670 in the majority opinion) now limits its application to drivers "whose *specific*

---

[1] Insurance Code section 488 reads, in part, as follows: "No insurer shall, in issuing or renewing a private passenger automobile insurance policy, increase the premium on that policy for the reason that the insured or applicant for insurance has been convicted for traffic violations committed while operating a motor vehicle for compensation during the hours of his employment if, with respect to a conviction, the employee or applicant has submitted to the

*duties* include driving their employer's motor vehicles . . . ." (Italics added.) If such a restriction applied to section 670, State Farm would not be bound to provide coverage for this particular loss. It seems logical to me the Teamsters Union intended to apply section 670 only to full-time professional drivers when it proposed this legislation. Nevertheless, as presently phrased, its application cannot be avoided in this case.

Respondent's petition for review by the Supreme Court was denied December 15, 1988.

---

insurer a written declaration made by the employee under penalty of perjury that the applicant or insured was, at that time, operating a motor vehicle for compensation during the hours of his or her employment. This section applies only to those individuals whose specific duties include driving their employer's motor vehicles . . . ." (Underscoring added; underscored portion is the pertinent part of the 1985 amendment.)