Filed 9/17/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MAJID MORADI, | B239858 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. LC089905) |
| v. | |
| MARSH USA, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank J. Johnson, Judge. Reversed.

Law Office of Wayne McClean, Wayne McClean; and Evan D. Marshall for Plaintiff and Appellant.

Acker & Whipple, Jerri L. Johnson and Kelley E. Harman for Defendant and Respondent.

_____

An employee of an insurance broker was required each workday to drive to and from the office in her personal vehicle. During the workday, the employee had to use her vehicle to visit prospective clients, make presentations, provide educational seminars, follow leads, and transport company materials and coemployees to work-related destinations.

On April 15, 2010, the employee left the office at the end of the workday and began driving in the direction of her home. She had decided that, on the way, she would stop for some frozen yogurt and take a yoga class. As the employee made a left turn at the yogurt shop, she collided with a motorcyclist.

The motorcyclist filed this action against the employee and her employer. The trial court granted the employer's motion for summary judgment on the ground that the employee was not acting within the scope of her employment when she was making a left turn to get to the frozen yogurt shop. The motorcyclist appealed.

We reverse. Because the employer required the employee to use her personal vehicle to travel to and from the office and make other work-related trips during the day, the employee was acting within the scope of her employment when she was commuting to and from work. The planned stops for frozen yogurt and a yoga class on the way home did not change the incidental benefit to the employer of having the employee use her personal vehicle to travel to and from the office and other destinations. On the day of the accident, the employee had used her vehicle to transport herself and some coemployees to an employer-sponsored program, and the employee had planned to use her vehicle the next day to drive to a prospective client's place of business. Nor did the planned stops constitute an unforeseeable, substantial departure from the employee's commute. Rather, they were a foreseeable, minor deviation. Finally, the planned stops were not so unusual or startling that it would be unfair to include the resulting loss among the other costs of the employer's business. Thus, under the "required vehicle" exception to the "going and coming" rule, the employee was acting within the scope of her employment at the time of the accident, and the doctrine of respondeat superior applies. Accordingly, the trial court erred in granting the employer's summary judgment motion.

# I

# BACKGROUND

The allegations and facts in this appeal are taken from the pleadings and the papers submitted in connection with the summary judgment motion.

Around 1997, Judy Bamberger commenced employment with Marsh USA, Inc., an insurance broker doing business as Marsh Risk & Insurance Services (Marsh). Bamberger worked at the Marsh office at 777 South Figueroa Street in downtown Los Angeles. She lived on Reforma Road in Woodland Hills.

Bamberger worked for Marsh as a salesperson. She was primarily responsible for developing new business. She generated new sales by cold-calling, forming relationships with influential people, providing educational seminars, making presentations, and becoming involved with different organizations such as the Chamber of Commerce, the Rotary Club, and insurance associations. She met with prospective clients, typically at their location and convenience; meetings could occur before, during, and after regular work hours. To reach these various destinations, Marsh required Bamberger to use her personal vehicle, a 2009 Nissan Maxima. She was allowed to stop and see prospective clients on the way home.

Two to five times a week, Bamberger used her personal vehicle to attend off-site appointments and meetings. She also used her personal vehicle to transport Marsh executives, clients, and coemployees to off-site meetings, appointments, and seminars.

There were about 10 employees, including Bamberger, in Marsh's Los Angeles office who were responsible for generating new business. Pursuant to company policy, they all had to use their personal vehicles to engage in sales and client development.

When Bamberger first began working at Marsh, the company provided vehicles to its salespersons to perform their job duties. Those cars were also available for personal use. Later, Marsh switched to a "car allowance" program under which the company made a monthly payment toward the lease or auto loan of its salespersons. Over the last five years, Bamberger and other salespersons were required to use their personal vehicles for business travel, and Marsh reimbursed them for business mileage.

On April 15, 2010, Bamberger had used her personal vehicle to transport herself and some coemployees to a company-sponsored program at a middle school in the Los Feliz area. When the program was over, she returned to the office. It was the end of the workday.

Bamberger planned to stop on the way home for some frozen yogurt and, thereafter, to attend a 6:00 p.m. yoga class. While at work, she changed clothes from business attire to active wear. Upon leaving the office, Bamberger drove north on the 110 Freeway, then west on the 101 Freeway. She took the De Soto Avenue exit and turned right onto westbound Ventura Boulevard, which had three lanes for traffic and a center lane for making left turns. At that point, Bamberger planned to drive westward, with stops at Menchie's frozen yogurt shop and the yoga studio before reaching home. Menchie's was approximately 600 feet west of the intersection of De Soto Avenue and Ventura Boulevard. The yoga studio was located a short distance—about three-tenths of a mile—to the west of Menchie's on Ventura Boulevard, between De Soto Avenue and Canoga Avenue. The distance from Menchie's to Bamberger's home, traveling west on Ventura Boulevard, was around two miles. All three destinations—Menchie's, the yoga studio, and Bamberger's home—were in Woodland Hills and had the same five-digit zip code: 91364.

To enter the parking lot for Menchie's, Bamberger moved from lane 1 of westbound Ventura Boulevard into the center lane to make a left turn. Traffic was heavy. Eastbound Ventura Boulevard had two lanes for traffic; a third lane—lane 3—was used for parking at that time of day. The eastbound traffic on Ventura Boulevard was backed up from the De Soto Avenue traffic signal, blocking the entrance to Menchie's. Eventually, the vehicles in lanes 1 and 2 of eastbound Ventura Boulevard created a "gap" so Bamberger could turn left. She commenced a left turn, not seeing that Majid Moradi was on his motorcycle, traveling between the eastbound lanes on Ventura Boulevard. Her vehicle collided with his motorcycle.

Bamberger had planned on using her personal vehicle for business travel the next day to meet a prospective client in Oxnard. Inside Bamberger's vehicle were materials to

4

be used at the meeting, including her laptop and a Marsh file regarding the prospective client. Bamberger intended to review those materials at home before meeting the prospective client. Because her vehicle was damaged in the accident, Bamberger rented a car and, on April 16, 2010, drove to a nearby shopping center, where a coworker picked her up. They went together to see the prospective client.

On May 26, 2010, Moradi filed this action against Bamberger. On September 8, 2010, Moradi filed an amendment to the complaint, adding Marsh as a defendant.

On March 2, 2011, Marsh filed a motion for summary judgment, contending it was not liable for the accident because, at the time of the collision, Bamberger "was neither at work, nor working, nor pursuing any task on behalf of her employer" but "was pursuing personal interests, namely, going to yoga class and stopping for yogurt on the way."

Moradi and Bamberger filed separate oppositions to the motion. Moradi argued that Marsh derived a benefit by having Bamberger travel to and from the office and other destinations in her personal vehicle: The vehicle was used before, during, and after the regular workday for Marsh's business purposes. Moradi asserted that Bamberger's commute to and from work was part of the employment relationship and was within the scope of her employment. Further, Moradi asserted that Bamberger had not "abandoned" her commute by stopping at the yogurt shop or by planning to attend a yoga class on the way home.

In her opposition, Bamberger argued: (1) the going and coming rule did not apply because Marsh derived an incidental benefit by requiring that she use her own vehicle when traveling for business, including trips to and from the office; (2) her plans to stop for frozen yogurt and a yoga class were foreseeable events; (3) she was not engaged in a "personal errand" at the time of the collision; and (4) she was acting within the scope of her employment when the accident occurred.

The trial court heard the summary judgment motion on November 10, 2011, and took the matter under submission. By minute order dated December 29, 2011, the trial court granted the motion. A signed judgment was filed on January 30, 2012. Moradi appealed. Bamberger did not.

## II

## DISCUSSION

"'"'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of *material* fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts [set forth] in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true.'" (*Buxbaum v. Aetna Life & Casualty Co.* (2002) 103 Cal.App.4th 434, 441, italics added.)

On appeal, Moradi and Marsh debate whether Bamberger was acting within the scope of her employment at the time of the accident.  We conclude that under the required vehicle exception to the going and coming rule, Bamberger was acting within the scope of her employment, and the doctrine of respondeat superior therefore applies.

"Under the theory of respondeat superior, employers are vicariously liable for tortious acts committed by employees during the course and scope of their employment. . . . However, under the 'going and coming' rule, employers are generally exempt from liability for tortious acts committed by employees while on their way to and from work because employees are said to be outside of the course and scope of employment during their daily commute." (*Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 301, citation omitted.)  "'The "going and coming" rule is sometimes ascribed to the theory that the employment relationship is "suspended" from the time the employee leaves [the

6

workplace] until he returns . . . or that in commuting he is not rendering service to his employer.'" (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 466.)

"'A well-known exception to the going-and-coming rule arises where the [employee's] use of [his or her own] car gives some *incidental benefit* to the employer. Thus, the *key inquiry* is whether there is an *incidental benefit* derived by the employer. . . .' . . . . This exception to the going and coming rule . . . has been referred to as the 'required-vehicle' exception. . . . The exception can apply if the use of a personally owned vehicle is either an express or implied condition of employment . . . , or if the employee has agreed, expressly or implicitly, to make the vehicle available as an accommodation to the employer and the employer has 'reasonably come to rely upon its use and [to] expect the employee to make the vehicle available on a regular basis while still not requiring it as a condition of employment.'" (*Lobo v. Tamco*, *supra*, 182 Cal.App.4th at p. 301, citations omitted, italics added.)

The required vehicle exception had its genesis in a workers' compensation case, *Smith v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 814 (*Smith*). As the Supreme Court described the question presented in *Smith*: "Under the well established going and coming rule, an employee does not pursue the course of his employment when he is on his way to or from work. . . . In a number of cases we have established exceptions to this rule, such as those in which the employer defrayed the travel expenses . . . and those in which the employee engaged in a special errand for his employer. . . . [Here, the wife of a deceased employee] contends that we should recognize another exception to the rule in the instant case: that at the time of the accident [the employee] was engaged in the course of his employment inasmuch as he was bringing his car to work as required by his employer." (*Id.* at pp. 815–816.) The employee, a social worker, was required to drive his own vehicle to and from the office so he could visit his clients on "field" days and be available to visit clients in case of an emergency on regular office days. (*Id.* at pp. 816, 818.) The high court agreed with the wife and recognized the required vehicle exception to the going and coming rule, stating: "Since the accident occurred when the employee drove his car to the employer's premises pursuant to the employer's requirement that the

7

employee furnish his own car, we hold that the so-called going and coming rule does not bar coverage." (*Id.* at p. 815.) "[T]he employer clearly benefited from [the employee's] bringing the car to work. Indeed, an employer must be conclusively presumed to benefit from employee action reasonably directed towards the execution of the employer's orders or requirements. An employer cannot request or accept the benefit of an employee's services and concomitantly contend that he is not 'performing service growing out of and incidental to his employment.'" (*Id.* at p. 820.)

As the court in *Smith* pointed out: "Surely in this day of a highly motorized society we cannot cast the going and coming rule as a protective cloak over the shoulders of the employer who, for his own advantage, demands that the employee furnish the car on the job. [In this case, the employee's] obligation reached out beyond the employer's premises, and, in driving his car to and from them, he did no more than fulfill the condition and requirement of his employment." (*Smith*, *supra*, 69 Cal.2d at p. 825.)

Although *Smith* was a workers' compensation case, some California courts have looked to decisions in that area for guidance in applying the doctrine of respondeat superior. (See *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967–968 & fn. 2; *Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 722; *Hinman v. Westinghouse Elect. Co.* (1970) 2 Cal.3d 956, 961–962 & fn. 3 (*Hinman*); *Huntsinger v. Glass Containers Corp.* (1972) 22 Cal.App.3d 803, 807–809 (*Huntsinger*); *Lobo v. Tamco*, *supra*, 182 Cal.App.4th at p. 301 & fn. 3.) Other courts, however, "have declined to apply workers' compensation principles to respondeat superior issues." (*Fields v. State of California* (2012) 209 Cal.App.4th 1390, 1398.)

In *Hinman*, *supra*, 2 Cal.3d 956, the plaintiff, a police officer, was standing on the center divider of a freeway inspecting a possible road hazard when he was struck by a car. The plaintiff filed suit against the driver's employer, contending the driver was acting within the scope of his employment while driving home. The driver was an elevator constructor's "helper" who was compensated for his roundtrip travel time and travel expense in driving his own vehicle to and from a particular job site. At the time of the

8

incident, the driver was going home at the end of the workday. The case was tried to a jury, which returned a verdict in the employer's favor. The plaintiff appealed.

The Supreme Court reversed, explaining that "the modern and proper basis of vicarious liability of the master is not his control or fault but the risks incident to his enterprise. 'We are not here looking for the master's fault but . . . for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has undertaken. . . . Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise.'" (*Hinman*, *supra*, 2 Cal.3d at p. 960.) The court commented that "exceptions will be made to the 'going and coming' rule where the trip involves an *incidental benefit* to the employer, not common to commute trips by ordinary members of the work force. . . . [T]hat the employee *receives personal benefits* is not determinative when there is also a benefit to the employer." (*Id.* at p. 962, italics added.) The court continued: "[W]here . . . the employer and employee have made the travel time part of the working day by their contract, the employer should be treated as such during the travel time, and it follows that so long as the employee is using *the time for the designated purpose, to return home*, the doctrine of *respondeat superior* is applicable. It is unnecessary to determine the appropriate rule to be applied *if the employee had used the time for other purposes*." (*Id.* at p. 962, italics added.)

In *Huntsinger*, *supra*, 22 Cal.App.3d 803, the survivors of Franklin Huntsinger— who was killed when his motorcycle collided with a truck driven by Edward Fell— brought suit against Fell and Fell's employer. The plaintiffs sought to hold the employer liable under the doctrine of respondeat superior. Fell, a "technical service representative," was responsible for consulting with customers by telephone and by visiting the customers' business premises. He used his own truck to drive to and from the office and also to travel to and from customer locations. Sometimes, Fell drove directly from home to a customer location and then drove to the office. Other times, he would stop at a customer location on the way home. On occasion, Fell carried work-related materials in his truck. The accident occurred when Fell was driving directly from the office to his home.

9

The case was tried to a jury.  When the plaintiffs rested, the trial court granted a nonsuit in the employer's favor, concluding that, as a matter of law, Fell was not acting within the scope of his employment at the time of the accident.  The Court of Appeal reversed, stating: "[The employer] contends that Fell's trip from the office to his home during which the accident occurred did not involve any incidental benefit to it not common to commute trips by ordinary members of its work force.  We do not agree.

"Presumably, ordinary members of [the employer's] work force would not be required to use their vehicles in company business and would not, therefore, be required to drive their vehicles to and from work.  The means by which they travel to and from work is a matter of complete indifference to [the employer].  No[t] so with respect to Fell.  Viewing the evidence most favorably to [the plaintiffs], Fell was required to use his automobile in carrying out his employment duties.  Obviously, this arrangement constituted a benefit to [Fell's employer].  Unless Fell drove his vehicle to and from the office, he would not have it available for the beneficial use of [his employer] when it was needed.  His driving his vehicle to and from the office was, therefore, *incidentally beneficial to* [*the employer*] in a manner not common to commute trips by ordinary members of its work force.  In other words, when a business enterprise requires an employee to drive to and from its office in order to have his vehicle available for company business during the day, accidents on the way to or from the office are statistically certain to occur eventually, and, the business enterprise having required the driving to and from work, the risk[s] of such accidents are risks incident to the business enterprise.  We do not deal, of course, with a case in which the employee *was not directly driving home but was engaged on some errand of his own*."  (*Huntsinger*, *supra*, 22 Cal.App.3d at p. 810, italics added.)

In recognizing the required vehicle exception in the tort context, the Court of Appeal in *Huntsinger* relied in part on the workers' compensation decision in *Smith*, *supra*, 69 Cal.2d 814.  (See *Huntsinger*, *supra*, 22 Cal.App.3d at pp. 807, 808–809.)  The court also found support in *Richards v. Metropolitan Life Ins. Co.* (1941) 19 Cal.2d 236, stating: "Although *Richards* relied to some extent upon authorities from the workmen's

10

compensation field, it was a tort case. There the employee was an insurance salesman whose duties included both office and field work; he was not required to report to the office before commencing work; if he had a sale or some other service call to make early in the morning, he would make it before going to the office, but rarely would he spend over half an hour in the field prior to reporting to the office in the morning; he was not compensated for the use of his vehicle. . . . On the morning of the accident he was on his way directly from his home to his office when the accident occurred. . . . The court held that, under these circumstances, the trier of fact could find the employee was acting within the scope of his employment at the time of the accident." (*Huntsinger*, at p. 809, citations omitted.)

In *Hinojosa v. Workmen's Comp. Appeals Bd*. (1972) 8 Cal.3d 150 (*Hinojosa*), a farm laborer, Miguel Hinojosa, worked for an operator of several noncontiguous fruit ranches. When the laborers finished work at one ranch, the foreman would direct them to another ranch. The laborers were expected to provide their own transportation between ranches. They were paid from the time they arrived at the first work location until they went home, including the time spent traveling between ranches. Hinojosa, who did not own a vehicle, rode with another laborer, Raphael Rodriguez, whom he paid $3.00 per week to share the cost of operating Rodriguez's vehicle. On June 8, 1970, after the two men had finished work and were traveling home, Rodriguez's vehicle collided with another vehicle, injuring Hinojosa, who sought workers' compensation benefits. In holding that Hinojosa was entitled to benefits, the Supreme Court observed: "[T]he courts have held non-compensable the injury that occurs during a local commute enroute to a fixed place of business at fixed hours in the absence of special or extraordinary circumstances. The decisions have thereby excluded the ordinary, local commute that marks the daily transit of the mass of workers to and from their jobs; the employment, there, plays no special role in the requisites of portage except the normal need of the presence of the person for the performance of the work.

"On the other hand, many situations do not involve local commutes en route to fixed places of business at fixed hours. These are the extraordinary transits that vary from

11

the norm because the employer requires a special, different transit, means of transit, or *use of a car*, for some particular reason of his own.  When the employer gains that kind of a particular advantage, the job does more than call for routine transport to it; it plays a different role, bestowing a special benefit upon the employer by reason of the extraordinary circumstances.  The employer's special request, his imposition of an unusual condition, removes the transit from the employee's choice or convenience and places it within the ambit of the employer's choice or convenience, restoring the employer-employee relationship." (*Hinojosa*, *supra*, 8 Cal.3d at p. 157, italics added.)

The Supreme Court continued:  "[T]he instant case clearly differs from the normal routine commute; it is instead the extraordinary situation in which the job is structured, and dependent upon, transportation from one place of work to another so that the use of an instrument of such transportation is a requisite of employment.  The employer could have provided, at his own expense, company vehicles to transport the workers between his various farms during their workday.  His failure to do so made it necessary for the workers to supply their own on-the-job transportation.  Thus [Hinojosa] made use of the car from his residence to the first ranch, and thereafter from ranch to ranch and finally from ranch to his residence because the car was an essential requirement of the job; the presence of the car was requisite to performance of the job; the worker was impliedly required to bring the car to the job and to take it from the job.  Thus the injury suffered in the car was covered by the Workmen's Compensation Act." (*Hinojosa*, *supra*, 8 Cal.3d at pp. 162–163.)

"To be sure, ordinary commuting is beyond the scope of employment . . . . Driving a required vehicle, however, is a horse of another color because it satisfies the control and benefit elements of *respondeat superior*.  An employee who is required to use his or her own vehicle provides an 'essential instrumentality' for the performance of the employer's work. . . . When a vehicle must be provided by an employee, the employer benefits by not having to have available an office car and yet possessing a means by which off-site visits can be performed by its employees. . . .

12

". . . When an employer requires an employee to use a personal vehicle, it exercises meaningful control over the method of the commute by compelling the employee to foreswear the use of carpooling, walking, public transportation, or just being dropped off at work." (*Carter v. Reynolds* (2003) 175 N.J. 402, 416–417 [815 A.2d 460, 468].)

In *Lazar v. Thermal Equipment Corp.* (1983) 148 Cal.App.3d 458 (*Lazar*), the Court of Appeal confronted the question left unanswered in *Hinman*, *supra*, 2 Cal.3d 956, and *Huntsinger*, *supra*, 22 Cal.App.3d 803: whether respondeat superior applies where an employee is required to drive a vehicle to and from work, and an accident occurs during the commute when the employee is pursuing a personal matter. As the court put it in *Lazar*: "In traveling to and from work, [the employee] was . . . acting in the scope of his employment, conferring a tangible benefit on his employer; the 'going and coming' rule is thus inapplicable. [¶] A further issue, however, is presented in this case, an issue which the courts in both *Hinman* and *Huntsinger*, *supra*, anticipated but refused to decide. In the case at bench, [the employee] decided that, before going home, he would stop at a shop and buy a certain, now forgotten, item. To further complicate the question, this shop and item were located in the opposite direction from [his] home. [¶] This question appears to be one of first impression under the modern doctrine of respondeat superior. . . . We therefore take a broad perspective and examine the rationale for the modern doctrine of respondeat superior before determining whether it applies to the facts before us." (*Lazar*, at p. 463.)

In *Lazar*, the employer manufactured heating equipment and pressure vessels for the aerospace industry. An employee, Richard Lanno, who was constantly on call as a troubleshooter, used the employer's truck to drive to and from work and other destinations such as customer sites. He was also allowed to use the truck for personal matters. Lanno was sometimes required to travel from his home directly to a job site in the morning. At other times, the employer's customers would call Lanno at home, after hours and on weekends, and he responded to those service calls. On one occasion, after Lanno had finished work for the day, he left the employer's business premises. Before heading home, Lanno decided to pick up an item at a store and drove in the opposite direction of

13

his residence. While driving to the store, Lanno hit another vehicle. The other driver sued Lanno's employer. The case was tried to a jury, which awarded $81,000 to the plaintiff but made a special finding that Lanno was not acting within the scope of his employment at the time of the accident. The plaintiff filed a motion for judgment notwithstanding the verdict, arguing that, as a matter of law, Lanno was acting within the scope of his employment. The trial court agreed, granted the motion, and entered judgment against the employer. The employer appealed.

The Court of Appeal affirmed the judgment notwithstanding the verdict, explaining: "'Although earlier authorities sought to justify the *respondeat superior* doctrine on such theories as "control" by the master of the servant, the master's "privilege" in being permitted to employ another, the third party's innocence in comparison to the master's selection of the servant, or the master's "deep pocket" to pay for the loss, "the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large."' . . . "'We are not here looking for the master's fault but . . . for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has undertaken. . . .'" . . . Categorization of an employee's action as within or outside the scope of employment thus begins with a question of foreseeability, i.e., whether the accident is part of the inevitable toll of a lawful enterprise.

". . . Rather than searching for nice distinctions which would place the employees' actions in or outside of the scope of employment, the [analysis examines] foreseeability: 'One way to determine whether the risk is inherent in, or created by, an enterprise is to

14

ask whether the actual occurrence was a generally foreseeable consequence of the activity.  However, "foreseeability" in this context must be distinguished from "foreseeability" as a test for negligence.  In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas "foreseeability" as a test for *respondeat superior* merely means that in the context of the particular enterprise an employee's conduct is *not so unusual or startling* that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' . . .

"One traditional means of defining this foreseeability is seen in the distinction between minor '*deviations*' and substantial '*departures*' from the employer's business.  The former are deemed foreseeable and remain within the scope of employment; the latter are unforeseeable and take the employee outside the scope of his employment.

" . . . 'The question is often one of fact, and the rule now established is that only a *substantial* deviation or *departure* takes the employee outside the scope of his employment.  If the main purpose of his activity is still the employer's business, it does not cease to be within the scope of the employment by reason of incidental *personal acts,* slight delays, or deflections from the most direct route.  The term "*deviation*" is ordinarily used to describe these minor deflections, and "*departure*" to describe the abandonment which takes the acts outside the scope of employment.' . . . More recently, the test was stated in this way:  'In assessing whether an employee's wrongful act was required by or incidental to his duties, the law defines occupational duties broadly.  The fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer. . . . For example, acts necessary to the *comfort, convenience, health, and welfare of the employee* while at work, though *strictly personal to himself* and not acts of service, do not take him outside the scope of his employment.' . . .

"In the case at bench, then, we are asked to decide whether Lanno's personal errand was a foreseeable deviation from the scope of his employment, or whether evidence or inferences therefrom have been presented which would lead a jury to believe

15

that this errand was an unforeseeable, substantial departure from his duties.  We hold that Lanno's deviation was a foreseeable and minor deviation.  [¶] . . .

"The evidence presented to the trial court was not controverted.  Lanno testified that on the day of the accident he left work and headed away from his home, planning to buy an item and then return directly home.  The evidence thus clearly showed that Lanno planned a minor errand to be carried out, broadly speaking, on the way home.  Lanno further testified that this type of errand occurred with his employer's permission.  No evidence was presented, nor could any inference be drawn from the evidence, showing that Lanno had any other object in mind that day than a brief stop at a store before going home.

"The evidence, then, leads ineluctably to the conclusion that Lanno's errand was a minor deviation from his employer's business.  While the specific act was one '*strictly personal*' to Lanno, it was 'necessary to his convenience' under the above-quoted standard . . . . *While this standard was suggested for deviations 'at work,' we think it is applicable to deviations made on the way home*, in the employer's vehicle, when the trip home benefits the employer.  Here, it would have been unreasonable and inconvenient for Lanno to drive his truck home, stop there, then return to purchase the needed item, passing work on the way.  The decision to stop to buy the item on the way home was one reasonably necessary to Lanno's comfort and convenience.  For this reason the detour must be considered a minor deviation.  [¶] . . .

"The detour was foreseeable for much the same reason.  While a decision to stop at a party, or a bar, or to begin a vacation, might not have been foreseeable, we can think of no conduct more predictable than an employee's stopping at a store to purchase a few items on the way home.  Where . . . the trip home is made for the benefit of the employer, in the employer's vehicle, accidents occurring during such minor and foreseeable deviations become part of the 'inevitable toll of a lawful enterprise.'

"No evidence or inference was presented in the trial court showing that Lanno's deviation was for any purpose other than to stop at a store before returning home.  Since

we find such a deviation to be minor and foreseeable, . . . the judgment notwithstanding the verdict was properly granted. . . .

". . . [W]e note that [the employer] makes much of the fact that Lanno was headed in the direction opposite his home at the time of the accident. Under the traditional doctrine of respondeat superior, [the employer] argues, a trip in such direction cannot be regarded as a slight deviation. . . . [The employer's] emphasis on Lanno's direction at the time of the accident asks us to elevate just such a nice inquiry into the decisive issue of this case. An employer's liability, however, should not turn simply on a point of the compass; the fact that the store Lanno decided to visit was to the north of his workplace, rather than to the south, is not the controlling factor in this case. Instead, the modern rationale for respondeat superior requires that liability be hinged on the foreseeability and substantiality of the employee's departure from his employer's business. Where . . . the deviation is insubstantial and foreseeable, the doctrine of respondeat superior will apply." (*Lazar*, *supra*, 148 Cal.App.3d at pp. 463–467, citations omitted, some italics added; accord, *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296–299; *Perez v. Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at pp. 967–968; *Bailey v. Filco, Inc*. (1996) 48 Cal.App.4th 1552, 1558–1561.)

Similarly, in *State Farm Mut. Auto. Ins. Co. v. Haight* (1988) 205 Cal.App.3d 223 (*Haight*), the Court of Appeal held that the required vehicle exception was applicable notwithstanding the employee's pursuit of a personal matter while driving home. In *Haight*, the employee worked for a building subcontractor and was required by his employer to use his own truck to travel to and from the employer's job sites and its office. The employee was also required to use his own truck to deliver materials and large equipment to the work sites. On the day of the accident, the employee's truck was in the garage for repairs, and he was using the company van to travel to and from various work destinations. At the end of the workday, he stopped first at the company office and then, while driving home, at a grocery store. After leaving the grocery store, the employee was involved in a collision with another vehicle. The employee had planned to use the van the next day to travel to a work site, and there were materials in the van related to that project.

17

The employer's insurance company denied coverage for the accident, asserting the employee was not acting within the scope of his employment because, prior to the collision, he had stopped to buy groceries. The insurer filed an action for declaratory relief, and the trial court entered judgment in favor of the insurer.

The Court of Appeal reversed, stating: "A well known exception to the going-and-coming rule arises where the use of the car gives some *incidental benefit* to the employer. . . . *The question is not who owns the vehicle* . . . , or whether the employee receives reimbursement by the employer for the vehicle . . . , or whether the employee performs a *personal errand while driving home*." (*Haight*, *supra*, 205 Cal.App.3d at p. 241, citations omitted, italics added & omitted.) "The evidence is uncontradicted [that the employee's] use of the company vehicle in his job clearly gave [the employer] an *incidental benefit*. [The employee] was driving a company vehicle with company equipment in the van and returning to his home from engaging in company activity. [The employee] had duties both in the office and in the field. He was required to *use his vehicle* to travel to work sites. He delivered materials *in his vehicle* to the work site. He was required to travel throughout the county and sometimes outside the county. It was an express condition of his employment that [the employee] use the vehicle in attending to his duties." (*Id.* at pp. 241–242, italics added.) Relying on *Huntsinger*, *supra*, 22 Cal.App.3d at page 810, the Court of Appeal observed: "[T]hat the accident occurred when [the employee] was on his way home from work is not determinative of the scope of employment." (*Haight*, at p. 242.) Applying the principles announced in *Lazar*, *supra*, 148 Cal.App.3d at pages 464 and 466, the court concluded: "The facts of *Lazar* are similar to those here. When [the employee] hit [the other driver's vehicle] with the company van he was . . . within the scope of his employment. The acts in question were foreseeable, within the scope of [the employee's] employment." (*Haight*, at p. 244, cited with approval in *Lobo v. Tamco*, *supra*, 182 Cal.App.4th at pp. 301, 303.)

As our Supreme Court has stated: "'In California, the scope of employment has been interpreted broadly under the respondeat superior doctrine. For example, '[t]he fact that an employee is not engaged in the *ultimate object of his employment* at the time of his

18

wrongful act does not preclude attribution of liability to an employer.' . . . Thus, acts necessary to the *comfort, convenience, health, and welfare* of the employee while at work, though *strictly personal* and not acts of service, do not take the employee outside the scope of employment. . . . Moreover, '"where the employee is *combining his own business with that of his employer*, or *attending to both at substantially the same time*, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer."'" (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1004, citations omitted, italics added.)

We conclude that the foregoing line of cases, starting with *Smith*, *supra*, 69 Cal.2d 814, dictates the outcome in the present case. On April 15, 2010, at the time of the accident, Bamberger was pursuing, at least in part, a personal objective by stopping for frozen yogurt and planning to attend a yoga class. But those activities did not constitute an unforeseeable, substantial departure from her commute. (See *Lazar*, *supra*, 148 Cal.App.3d at pp. 464–465; *Haight*, *supra*, 205 Cal.App.3d at p. 242.) Rather, they were a foreseeable, minor deviation on her drive home. We cannot say that Bamberger's planned deviation was "'so *unusual or startling* that it would seem unfair to include the loss resulting from it among other costs of [Marsh's] business.'" (*Lazar*, at p. 464, italics added; see *Lisa M. v. Henry Mayo Newhall Memorial Hospital*, *supra*, 12 Cal.4th at p. 299.)

"The question is . . . whether . . . the use of the car gives some *incidental benefit* to the employer." (*Haight*, *supra*, 205 Cal.App.3d at p. 241, italics added; accord, *Hinojosa*, *supra*, 8 Cal.3d at p. 157; *Hinman*, *supra*, 2 Cal.3d at p. 962; *Smith*, *supra*, 69 Cal.2d at p. 820; *Lobo v. Tamco*, *supra*, 182 Cal.App.4th at p. 301; *Singh v. Board of Retirement* (1996) 41 Cal.App.4th 1180, 1187; *Huntsinger*, *supra*, 22 Cal.App.3d at p. 810). On average, Bamberger used her personal vehicle two to five times a week to attend off-site appointments and meetings. On the day of the accident, she had used her vehicle during regular work hours to drive herself and some coemployees to a company-sponsored program. And when the accident happened, Bamberger was driving home from work and

planned on using her vehicle the next day to travel to Oxnard, where she would meet a prospective client.

In addition, Bamberger's planned deviation was necessary for her comfort, convenience, health, and welfare. (See *Farmers Ins. Group v. County of Santa Clara, supra*, 11 Cal.4th at p. 1004; *Lazar, supra*, 148 Cal.App.3d at pp. 465–466.) "[W]e can think of no conduct more predictable than an employee's stopping [for something to eat or taking an exercise class] . . . on the way home. Where, as here, the trip home is made for the benefit of the employer, . . . accidents occurring during such minor and foreseeable deviations become part of the 'inevitable toll of a lawful enterprise.'" (*Lazar*, at p. 466; accord, *Hinman, supra*, 2 Cal.3d at p. 960.) It would have been "unreasonable and inconvenient" for Bamberger to drive all the way home, stop momentarily, turn around, and drive back to the yogurt shop and the yoga studio. (See *Lazar*, at p. 466.)

And "'[i]t is the established rule in this jurisdiction that where the servant is combining *his own business with that of his master*, or *attending to both at substantially the same time*, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured.'" (*Lazar, supra*, 148 Cal.App.3d at pp. 466–467, italics added; accord, *Farmers Ins. Group v. County of Santa Clara, supra*, 11 Cal.4th at p. 1004.) In this case, Bamberger planned on stopping for frozen yogurt and attending a yoga class—her "own business"—while *driving* home—a consequence of Marsh's required vehicle policy. Thus, at the time of the accident, Bamberger was either combining her own business (yogurt and yoga) with Marsh's business (driving her personal vehicle home) or was attending to both her own business and Marsh's business at substantially the same time. Bamberger was "directly or indirectly" serving Marsh when the accident occurred, and we will not inquire "as to which business [she] was actually engaged in when a third person was injured." (*Lazar*, at pp. 466–467; accord, *Farmers Ins. Group*, at p. 1004.)

In sum, under the required vehicle exception to the going and coming rule, Bamberger was acting within the scope of her employment at the time of the accident. We find nothing to the contrary in the "special errand" cases upon which Marsh relies.

20

Those cases concern an exception to the going and coming rule that is *different from and more narrow than* the required vehicle exception. As the Court of Appeal noted in *Felix v. Asai* (1987) 192 Cal.App.3d 926 (*Felix*): "The *special-errand* exception to the going-and-coming rule is stated as follows: 'If the employee is not simply on his way from his home to his normal place of work or returning from said place to his home for his own purpose, but is coming from his home or returning to it on a *special errand* either as part of his regular duties or at a specific order or request of his employer, the employee is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons'" (*id.* at p. 931, italics added.)[1]

In *Felix*, the Court of Appeal gave "[s]everal general examples of the special-errand exception[, saying:] . . . One would be where an employee goes on a business errand for his employer leaving from his workplace and returning to his workplace. Generally, the employee is acting within the scope of his employment while traveling to the location of the errand and returning to his place of work. . . . The exception also may be applicable to the employee who is called to work to perform a special task for the employer at an irregular time. The employee is within the scope of his employment during the entire trip from his home to work and back to his home. . . . The exception is further applicable where the employer asks an employee to perform a special errand after the employee leaves work but before going home. In this [last example] . . . , the employee is normally within the scope of his employment while traveling to the special errand and while traveling home from the special errand." (*Felix*, *supra*, 192 Cal.App.3d at pp. 931–932, citations omitted.)

---

[1] The term "special errand" is used interchangeably with "business errand" and "special mission." (See, e.g., *Schreifer v. Industrial Acc. Com.* (1964) 61 Cal.2d 289, 291–293; *Felix v. Asai*, *supra*, 192 Cal.App.3d at pp. 931–932; *Jeewarat v. Warner Bros. Entertainment, Inc.* (2009) 177 Cal.App.4th 427, 435–436.)

The Court of Appeal pointed out that "[i]n determining whether an employee has completely abandoned pursuit of a *business errand* for pursuit of a personal objective, a variety of relevant circumstances should be considered and weighed. Such factors may include [(1)] the intent of the employee, [(2)] the nature, time and place of the employee's conduct, [(3)] the work the employee was hired to do, [(4)] the incidental acts the employer should reasonably have expected the employee to do, [(5)] the amount of freedom allowed the employee in performing his duties, and [(6)] the amount of time consumed in the personal activity. . . . While the question of whether an employee has departed from his *special errand* is normally one of fact for the jury, where the evidence clearly shows a complete abandonment, the court may make the determination that the employee is outside the scope of his employment as a matter of law." (*Felix*, *supra*, 192 Cal.App.3d at pp. 932–933, citation omitted, italics added; accord, *O'Connor v. McDonald's Restaurants* (1990) 220 Cal.App.3d 25, 30–33; *Trejo v. Maciel* (1966) 239 Cal.App.2d 487, 495–497.)

Here, the required vehicle exception to the going and coming rule, not the special errand exception, governs our analysis. Accordingly, we have not applied the six factors used in special errand cases to determine whether Bamberger was acting within the scope of her employment at the time of the accident. (See *Smith*, *supra*, 69 Cal.2d at pp. 815–816 [describing exceptions to going and coming rule]; Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2012) ¶¶ 2:771, 2:781 to 2:786, 2:802 to 2:804, pp. 2(II)-35, 2(II)-37 to 2(II)-39, 2(II)-41 to 2(II)-42 [distinguishing between special errand exception and required vehicle exception to going and coming rule]; Comment, *Pouring New Wine into an Old Bottle: A Recommendation for Determining Liability of an Employer Under Respondeat Superior* (1994) 39 S.D. L.Rev. 570, 588–591 [discussing exceptions to going and coming rule].)

Rather, we have applied the relevant principles under the required vehicle exception. Those principles differ from the six factors used to determine whether the special errand exception applies. In the present case, Marsh required Bamberger to use her personal vehicle to travel to and from the office and other destinations. She also had

22

to use her personal vehicle before, during, and after regular work hours to develop new business.  We have properly examined whether Bamberger's use of her personal vehicle conferred an incidental benefit on Marsh—it did; whether her planned stops at the frozen yogurt shop and the yoga studio were an unforeseeable, substantial departure from her commute—they were not; whether they were a foreseeable, minor deviation from her regular commute—they were; whether they were not so unusual or startling that it would be unfair to include the resulting loss among the other costs of the employer's business— they were not; and whether they were necessary for Bamberger's comfort, convenience, health, and welfare—they were.  (See, *Smith*, *supra*, 69 Cal.2d at pp. 820, 825; *Hinman*, *supra*, 2 Cal.3d at pp. 960, 962; *Huntsinger*, *supra*, 22 Cal.App.3d at p. 810; *Hinojosa*, *supra*, 8 Cal.3d at pp. 157, 162–163; *Lazar*, *supra*, 148 Cal.App.3d at pp. 463–467; *Haight*, *supra*, 205 Cal.App.3d at pp. 241–242, 244; *Farmers Ins. Group v. County of Santa Clara, supra*, 11 Cal.4th at p. 1004.)  Those are not the pertinent considerations in a special errand case.

By way of example, in *Felix*, *supra*, 192 Cal.App.3d 926, two individuals (employers) owned an appliance store in the City of Merced and, one day, they instructed an employee to deliver some mail to the post office on his way home from work.  The employee left the store shortly before 5:00 p.m.  Using his own vehicle, he went to the post office, delivered the mail, and then drove toward the City of Atwater, where his parents lived.  He intended to have dinner with them.  The trip to Atwater took the employee back toward the appliance store and his apartment.  But he did not get very far.  Within a block of the appliance store, the employee hit a pedestrian, who sued the employee and the employers for personal injuries.  The trial court granted summary judgment for the employers on the ground that the employee was not acting within the scope of his employment when he hit the pedestrian.  The pedestrian appealed.

The Court of Appeal affirmed, applying the six-factor test used in special errand cases.  (See *Felix*, *supra*, 192 Cal.App.3d at pp. 932–934.)  The court said:  "As conceded by [the employers], [the employee] had been sent on a *special errand* . . . just prior to the accident.  Slightly before [the employee's] normal quitting time, 5 p.m., he was sent to the

23

post office . . . to deliver some mail . . . . He was then authorized to go home. Consequently, [the employee] would have been acting within the scope of his employment during that portion of his journey between [the appliance store] and the post office, as well as that portion of his journey between the post office and his home . . . in Merced had [he] gone directly home. . . .

"The pivotal question in this case, then, is whether [the employee's] clear and undisputed intent to go directly to his parents' home in Atwater from the post office constituted a complete abandonment of his [employers'] business. In our view, it did. Had [the employee's] parents lived in a place equally distant but at a location that would have caused [the employee] to drive from the post office in a direction *away* from both [the appliance store] and [his] apartment, we doubt it would be argued seriously that [the employee] was still engaged in a *special errand* or on his [employers'] business after leaving the post office bound for his parents' home. So long as [the employee] intended to proceed directly to his parents' home, bypassing his own apartment . . . , we can see no logical or public policy reason for a different result where the location of the parents' home takes him in a direction leading back toward the [employers'] place of business, or toward [his] own apartment, for that matter. In either case, once he has delivered the mail and leaves the post office intending to drive directly to his parents' home, he has completed his [employers'] business and is pursuing a purely personal objective. On the facts of this case, we hold that prior to the accident in which [the pedestrian] was injured, [the employee] had completed his special errand for [his employers], had completely abandoned his [employers'] business, was pursuing a purely personal objective, and was not in the scope of his employment at the time of the accident." (*Felix*, *supra*, 192 Cal.App.3d at pp. 933–934, citation omitted, italics added.)

In *Felix*, the Court of Appeal cited *Loper v. Morrison* (1944) 23 Cal.2d 600 (*Loper*) as the primary source of the six-factor test used in special errand cases. (See *Felix*, *supra*, at pp. 932–933.) *Loper* has been cited in two types of cases: (1) where one of the parties has relied on the special errand exception to the going and coming rule (see, e.g., *Kephart v. Genuity, Inc.* (2006) 136 Cal.App.4th 280, 291–292; *Tognazzini v. San*

24

*Luis Coastal Unified School Dist*. (2001) 86 Cal.App.4th 1053, 1056–1058; *Felix*, *supra*, 192 Cal.App.3d at pp. 931–933; *Trejo v. Maciel*, *supra*, 239 Cal.App.2d at pp. 494–497); *O'Connor v. McDonald's Restaurants*, *supra*, 220 Cal.App.3d at pp. 30–33; *Vivion v. National Cash Register Co.* (1962) 200 Cal.App.2d 597, 605–606), and (2) where the basic principles of respondeat superior have been explained (see, e.g., *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 76–81 & fn 5; *Johnson v. Banducci* (1963) 212 Cal.App.2d 254, 262–264; *Duff v. Schaefer Ambulance Service, Inc.* (1955) 132 Cal.App.2d 655, 667–670, 677; *Loos v. Boston Shoe Co*. (1954) 123 Cal.App.2d 564, 565–569).

*Loper* was decided in 1944—28 years before California recognized the required vehicle exception for purposes of respondeat superior. (See *Lobo v. Tamco*, *supra*, 182 Cal.App.4th at p. 301 [stating that *Huntsinger*, *supra*, 22 Cal.App.3d 803, decided in 1972, "carved out" required vehicle exception].) Nevertheless, *Loper* supports our conclusion that Bamberger was acting within the scope of her employment at the time of the accident.

In *Loper*, an individual, Cameron Morrison, was employed by a dairy "to make deliveries of milk and other dairy products within a designated area, to collect from customers and to solicit new business. Deliveries were made in a truck furnished by [the dairy], but Morrison used his own car in collecting accounts and soliciting new business after regular hours." (*Loper*, *supra*, 23 Cal.2d at p. 603.) One afternoon, Morrison left the office, using his own vehicle. He intended to call on a prospective customer and collect on a delinquent account of an existing customer, Mrs. Hanson. Morrison also offered a coworker a ride home. After calling on the prospective customer, Morrison drove to Hanson's home, arriving around 4:00 p.m. No one was there. Morrison decided to make another attempt to collect from Hanson and to return around 5:30 p.m. In the meantime, Morrison and the coworker went to a tavern and had lunch, consisting of sandwiches and beer. From the tavern, Morrison took the coworker home. While driving toward Hanson's home, Morrison struck another vehicle. A lawsuit was filed against Morrison and the dairy. The case was tried to a jury, which returned a verdict against

25

both defendants. The dairy appealed, arguing that, as a matter of law, Morrison was not acting within the scope of his employment when the accident occurred.

The Supreme Court rejected the dairy's contention and affirmed the judgment. As the court stated: "Morrison worked on a straight salary with no commissions, and all the money he collected was turned over to [the dairy]. He did not buy milk from [the dairy] and sell it to customers. The money due from Mrs. Hanson was owed to [the dairy] and in attempting to collect the account, Morrison was performing a duty imposed by his employer and within the scope of his employment. And there is evidence that Morrison, to his employer's knowledge, frequently called upon customers after his regular hours, using his own car. This is sufficient to support a finding that he was authorized to do this type of work at the time the accident took place.

"[The dairy] . . . contends that we are bound to conclude, as a matter of law, that when Morrison left the Hanson house to take Dolan home, he abandoned the business of his employer and entered upon a mission of his own and had not re-entered his employer's business when the accident occurred, and that therefore he was not acting within the scope of his employment at the time of the accident. . . . 'Whether there has been a deviation so material or substantial as to constitute a complete departure is usually a question of fact. In some cases the deviation may be so marked, and in others so slight relatively, that the court can say that no conclusion other than that the act was or was not a departure could reasonably be supported . . . .' . . .

"Under the circumstances of this case we cannot hold as a matter of law that Morrison's trip to the tavern and to Dolan's home constituted an abandonment of his employer's business. . . . [I]t was within Morrison's authority to collect accounts at the time the accident occurred. The employer's liability was not necessarily terminated by reason of the fact that Morrison combined a private purpose of his own with the business of his employer. . . . Thus, if the accident had occurred on the trip from the dairy to the Hanson home prior to 4 p. m., the jury clearly could have found that Morrison was acting within his employment although he intended thereafter to get something to eat, and take Dolan home." (*Loper*, *supra*, 23 Cal.2d at pp. 604–606.)

26

The court concluded: "[A] deviation from the most direct route . . . before going to the Hanson home would not necessarily have constituted an abandonment. . . . The deviation cases, although not identical with the situation here involved, are quite analogous. Morrison, upon finding no one at home, believed that he would have to wait over an hour before he could see Mrs. Hanson. If he had spent this time in his car in front of the house he would have remained within the scope of his employment. His conduct in going elsewhere for some private purpose while waiting to perform his specific duties presented a question of fact as to whether he had entirely abandoned the business of his employer. . . . The employer might reasonably expect that his employee, while so waiting, would engage in some activities for his own purposes. [In this case], Morrison, who began work at 3 a. m., had not eaten since breakfast, and the fact that he went to a tavern for sandwiches and beer does not require us to hold that he had abandoned his employment, particularly in view of his testimony that he would not have been at the tavern if he had not been waiting to call upon Mrs. Hanson. And, considering the time he had to wait, we cannot hold as a matter of law that it was unreasonable for him to travel somewhat less than two miles for this purpose. . . . [U]nder these circumstances, we cannot say that his going a short distance farther to take [a coworker] home was such an unreasonable means of using his time that it must be deemed an abandonment of his employment. Morrison's purpose at the time of the accident was to serve his employer, and it could be reasonably inferred that such purpose continued throughout the period he waited to see Mrs. Hanson." (*Loper*, *supra*, 23 Cal.2d at pp. 606–607, citation omitted.)

Similarly, when Bamberger was using her personal vehicle to drive home on April 15, 2010, she "was performing a duty imposed by [her] employer and within the scope of [her] employment." (*Loper*, *supra*, 23 Cal.2d at p. 604.) Put another way, Bamberger's drive home was within the scope of her employment because Marsh required her to drive her personal vehicle to and from work and other destinations. In addition, Bamberger's planned deviation—stopping for frozen yogurt and a yoga class—was "so slight relatively, that [we] can say that no conclusion other than that the [deviation] . . . was *not* a departure could reasonably be supported." (*Id.* at p. 605, italics added.)

27

Further, Marsh could "reasonably expect" that Bamberger, while driving home, "would engage in some activities for [her] own purposes." (*Loper*, *supra*, 23 Cal.2d at p. 607.) And if Morrison's personal pursuits in *Loper*—going to a tavern for sandwiches and beer and driving a coworker home—did not preclude a finding of liability on the part of the employer, neither did Bamberger's deviation.

Finally, Marsh's reliance on *Ducey v. Argo Sales Co.*, *supra*, 25 Cal.3d 707, is misplaced. In *Ducey*, the plaintiffs filed suit against a company based on a motor vehicle accident caused by a company employee. The jury returned a verdict in favor of the company. The plaintiffs appealed, contending that, under the required vehicle exception to the going and coming rule, the employee was acting within the course of her employment as a matter of law.

The Supreme Court rejected the plaintiffs' contention, concluding the jury implicitly found that the employer *did not require* the employee to use her personal vehicle to travel to and from work, and substantial evidence supported the jury's finding. (See *Ducey v. Argo Sales Co.*, *supra*, 25 Cal.3d at pp. 721–723.) As the high court concluded: "The evidence does not establish as a matter of law that the company required [the employee], as a condition of her employment, to commute to work in her personal car. The job was not one that embraced driving, and [the employee] was not required to use her vehicle for field work. Although there was evidence that she occasionally ran errands for her employer, these trips were not conclusively shown to be a condition of her employment. The jury could reasonably have believed that [the employee] was acting as a volunteer in running occasional errands for replacement items. She was not engaged in such an errand at the time of the accident. There is no evidence that [the employee] was required to go from location to location during the day." (*Id*. at p. 723.) In the present case, there is no dispute that the required vehicle exception applies.

In sum, under the required vehicle exception to the going and coming rule, Bamberger was acting within the scope of her employment at the time of the accident. The trial court therefore erred in granting Marsh's motion for summary judgment.

## III

## DISPOSITION

The judgment is reversed.  Plaintiff is entitled to costs on appeal.

CERTIFIED FOR PUBLICATION.


MALLANO, P. J.

I concur:


JOHNSON, J.

Rothschild, J., concurring in part and concurring in the judgment:

I agree that because Bamberger's planned stops on the way home were minor deviations rather than substantial departures from her normal commute, the required vehicle exception to the coming and going rule applies. I therefore concur in the judgment.

ROTHSCHILD, J.